UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

RECEIVED
SDNY DOCKET UNIT
2020 FEB 14 PM 3: 27

Maria Theresa C. Vinluan, on her own behalf and

on behalf of her minor child, WV

Write the full name of each plaintiff.

-against-

Ardsley Union Free School District and, individually,

Jeanne Farruggio and Thomas Fischer

Write the full name of each defendant. If you need more
space, please write "see attached" in the space above and
attach an additional sheet of paper with the full list of
names. The names listed above must be identical to those
contained in Section II.

19 _CV_ 10674 (NSR) [rel. 19-CV-06496]

(Include case number if one has been
assigned)

**AMENDED
COMPLAINT**

Do you want a jury trial?
☑ Yes    ☐ No

---

## NOTICE

The public can access electronic court files. For privacy and security reasons, papers filed
with the court should therefore *not* contain: an individual's full social security number or full
birth date; the full name of a person known to be a minor; or a complete financial account
number. A filing may include *only*: the last four digits of a social security number; the year of
an individual's birth; a minor's initials; and the last four digits of a financial account number.
See Federal Rule of Civil Procedure 5.2.

## I.   BASIS FOR JURISDICTION

Federal courts are courts of limited jurisdiction (limited power). Generally, only two types of cases can be heard in federal court: cases involving a federal question and cases involving diversity of citizenship of the parties. Under 28 U.S.C. § 1331, a case arising under the United States Constitution or federal laws or treaties is a federal question case. Under 28 U.S.C. § 1332, a case in which a citizen of one State sues a citizen of another State or nation, and the amount in controversy is more than $75,000, is a diversity case. In a diversity case, no defendant may be a citizen of the same State as any plaintiff.

What is the basis for federal-court jurisdiction in your case?

☑   **Federal Question**

☐   **Diversity of Citizenship**

### A.   If you checked Federal Question

Which of your federal constitutional or federal statutory rights have been violated?
IDEA; Section 504 of the Rehabilitation Act of 1973;

Title II of the American with Disabilities Act; Section 1983 of the Civil Rights Act of 1871

for violations of the Fourteenth, the Fourth, and the Eighth Amendments;

Section 1985 of the Civil Rights Act of 1871

### B.   If you checked Diversity of Citizenship

#### 1.   Citizenship of the parties

Of what State is each party a citizen?

The plaintiff , Maria Theresa C, Vinluan                    , is a citizen of the State of
(Plaintiff's name)

New York

(State in which the person resides and intends to remain.)

or, if not lawfully admitted for permanent residence in the United States, a citizen or subject of the foreign state of

.

If more than one plaintiff is named in the complaint, attach additional pages providing information for each additional plaintiff.

If the defendant is an individual:

The defendant, **See Attachment**_____, is a citizen of the State of

(Defendant's name)

_____

or, if not lawfully admitted for permanent residence in the United States, a citizen or subject of the foreign state of

_____

If the defendant is a corporation:

The defendant, Ardsley Union Free School District , is incorporated under the laws of

the State of **New York**

and has its principal place of business in the State of **New York**

or is incorporated under the laws of (foreign state) _____

and has its principal place of business in 500 Farm Road, Ardsley, NY 10502 .

If more than one defendant is named in the complaint, attach additional pages providing information for each additional defendant.

## II.  PARTIES

### A.  Plaintiff Information

Provide the following information for each plaintiff named in the complaint. Attach additional pages if needed.

| Maria Theresa | C | Vinluan |
|---|---|---|
| First Name | Middle Initial | Last Name |

95 Bradley Ave
_____
Street Address

| White Plains | NY | 10607 |
|---|---|---|
| County, City | State | Zip Code |

| (917)757-8236 | tescvin@gmail.com |
|---|---|
| Telephone Number | Email Address (if available) |

## B. Defendant Information

To the best of your ability, provide addresses where each defendant may be served. If the correct information is not provided, it could delay or prevent service of the complaint on the defendant. Make sure that the defendants listed below are the same as those listed in the caption. Attach additional pages if needed.

**Defendant 1:**

| Ardsley UFSD | |
|---|---|
| First Name | Last Name |

c/o Stanley Camhi, Esq. and Jillian Lee McNeil, Esq., Jaspan Schlesinger, LLP

Current Job Title (or other identifying information)

300 Garden City Plaza Floor #5

Current Work Address (or other address where defendant may be served)

| Garden City | NY | 11530 |
|---|---|---|
| County, City | State | Zip Code |

**Defendant 2:**

| Jeanne | Farruggio |
|---|---|
| First Name | Last Name |

Asst Superintendent for the Ardsley UFSF

Current Job Title (or other identifying information)

c/o Jillian L. McNeil, Esq.  300 Garden City Plaza Floor #5

Current Work Address (or other address where defendant may be served)

| Garden City | NY | 11530 |
|---|---|---|
| County, City | State | Zip Code |

**Defendant 3:**

| Thomas | Fischer |
|---|---|
| First Name | Last Name |

School Psychologist, Ardsley UFSD

Current Job Title (or other identifying information)

c/o Jillian L. McNeil, Esq.  300 Garden City Plaza Floor #5

Current Work Address (or other address where defendant may be served)

| Garden City | NY | 11530 |
|---|---|---|
| County, City | State | Zip Code |

Defendant 4:

First Name                    Last Name

Current Job Title (or other identifying information)

Current Work Address (or other address where defendant may be served)

County, City                  State            Zip Code

## III. STATEMENT OF CLAIM

Place(s) of occurrence:  Ardsley UFSD

Date(s) of occurrence:  March 2007 – Aug 2007; school years 2013-14 through 2018-19

## FACTS:

State here briefly the FACTS that support your case. Describe what happened, how you were harmed, and what each defendant personally did or failed to do that harmed you. Attach additional pages if needed.

SEE ATTACHMENT

Page 5

**INJURIES:**

If you were injured as a result of these actions, describe your injuries and what medical treatment, if any, you required and received.

Among others noted in the ATTACHMENT, WV was caused to suffer deprivation of his ~~rights under State and federal laws, losses of educational opportunities and benefits,~~ severe emotional distress, humiliation, physical distress, compromise to his academic ~~standing and access to opportunities and benefits affected by that standing. Among~~ others noted in the ATTACHMENT, Parent was caused to suffer deprivation of her rights ~~under State and federal laws, had to bear the burden and inconveniences of mitigating~~ damage to WV through seeking private treatment and taking legal action, thus sustaining ~~her own independent injuries.~~
SEE ATTACHMENT

## IV. RELIEF

State briefly what money damages or other relief you want the court to order.

Declaration that WV was denied a free and appropriate public education under the IDEA ~~for the 2017-18 SY and under Section 504 of the RA during the other years in question;~~ Compensation for damages not already reimbursed through the administrative ~~proceedings; award of attorneys fees, witness fees, and other costs incurred during~~ litigation; declaratory and injunctive relief. Relief for pecuniry and non-pecuniary ~~damages, including nominal, compensatory, and punitive or exemplary.~~

## V.  PLAINTIFF'S CERTIFICATION AND WARNINGS

By signing below, I certify to the best of my knowledge, information, and belief that: (1) the complaint is not being presented for an improper purpose (such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation); (2) the claims are supported by existing law or by a nonfrivolous argument to change existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Federal Rule of Civil Procedure 11.

I agree to notify the Clerk's Office in writing of any changes to my mailing address. I understand that my failure to keep a current address on file with the Clerk's Office may result in the dismissal of my case.

Each Plaintiff must sign and date the complaint. Attach additional pages if necessary. If seeking to proceed without prepayment of fees, each plaintiff must also submit an IFP application.

| February 14, 2020 | | _Maria Theresa Vinluan_ |
|---|---|---|
| Dated | | Plaintiff's Signature |
| Maria Theresa | C. | Vinluan |
| First Name | Middle Initial | Last Name |
| 95 Bradley Ave | | |
| Street Address | | |
| White Plains | NY | 10607 |
| County, City | State | Zip Code |
| (917)757-8236 | tescvin@gmail.com | |
| Telephone Number | Email Address (if available) | |

I have read the Pro Se (Nonprisoner) Consent to Receive Documents Electronically:
☑ Yes    ☐ No

If you do consent to receive documents electronically, submit the completed form with your complaint. If you do not consent, please do not attach the form.

# ATTACHMENT TO AMENDED COMPLAINT

## BASIS OF JURISDICTION

1. Upon information and belief, Plaintiff Maria Theresa C. Vinluan (hereinafter "Parent"), asserts that defendants Jeanne Farruggio and Thomas Fischer are citizens of the State of New York.

2. Parent's claims under the IDEA have been exhausted, having been presented for adjudication through both the impartial hearing process as well as through the Office of State Review. and a record of administrative proceedings has been created.

3. For claims for which  remedies were no longer deemed to be available, Parent asserts that her inability to seek earlier remedies for those years was justified by her lack of understanding of the full scope of New York State's general curriculum—specifically,  the obligations of public schools to ensure students' achievement of all State learning standards, including those under the heading of Career Development and Occupational Studies (CDOS), which encompass functional skills that are not traditionally considered "academic."

4. The Board Certified Behavior Analyst (BCBA) evaluation for WV, awarded through the administrative procedures and requested to determine WV's current residual difficulties that would impact current and postsecondary functioning, renders futile the further exhaustion of administrative procedures in that no remedies other than that already given would have been available through the IDEA at this time.


## ALLEGATIONS

1. WV is a 17-year old student attending Respondent-District's high school.

2. The District is a public school district of New York State and is thereby under obligation to implement policies and practices that comport with New York State Laws and the Regulations of the New York State Commissioner of Education (hereinafter "8 NYCRR") and with federal laws and statutes.

3. The District is a recipient of federal funding.

4. WV first received service under the IDEA through the Early Intervention programs.

5. WV's problem behaviors, at the time he was first identified as a child with a disability, consisted of difficulties with communication and rigidity that manifested as failure to comply with instructions.  These were deemed severe enough to impair his future ability to learn in school.

6.    WV was seen by a pediatric neurologist, Isabel Rapin, who deemed WV to have Asperger Syndrome—a condition among the Autism Spectrum Disorders, in accordance with the *Diagnostic and Statistical Manual of Mental Disorders, 4th Edition* (DSM-IV).

7.    Under the IDEA's classifiable conditions, WV's behaviors were likewise consistent with the statute's definition of Autism-- a "developmental disability significantly affecting verbal and nonverbal communication and social interaction …that adversely affects a student's educational performance." Thus, WV was classified as a preschool child with a disability under the IDEA.

8.    As WV was substantially limited in the major life activities of communication, socialization, and learning, he also qualified as a student with disability under Section 504.

9.    For the school years 2005-06 and 2006-07, the District's Committee on PreSchool Special Education (CPSE) approved for WV to receive intensive full day services, including extended school year and parent training, provided by the Fred S. Keller School.

10. The Fred S. Keller School is a school that employs Comprehensive Application of Behavior Analysis to Schooling (CABAS).

11. Applied Behavior Analysis (ABA) is a science or method often used with teaching autistic children.

12. WV greatly improved under the ABA based methods and his problem behaviors became less prominent.

13. In 2007, upon his transition from preschool  to elementary school and termination of services provided by the CPSE, Parent referred WV for an evaluation by the Committee on Special Education (CSE) for continued services.

14. Because WV's improvement had rendered the manifestations of his disability more subtle, Parent specifically requested that the CSE perform a formal evaluation targeting Asperger Syndrome/Autism as part of his eligibility determination.

15. In 2007, Jeanne Farruggio, the District's current Asst. Superintendent of Pupil Personnel Services and Special Education, first began her employment as the District's new Director of Special Education.

16. Ms. Farruggio oversaw WV's evaluations and chaired his eligibility meeting in August 2007.

17. It bears noting that, in a 2017 due process hearing concerning WV's brother, MV, Ms. Farruggio  testified that, since she first became the District's head of special education in 2007, she had become familiar with the case of MV.

18. Ms. Farruggio also testified that she had chaired MV's CSE meetings and that, in her position as Head of Special Education, she is asked to chair the more difficult cases, thus indicating that Parent had been marked by District personnel as a difficult case.

19. It bears noting that, around the time Ms. Farruggio was assuming her new position in 2007, Parent had been concluding litigation for MV, of which advocacy Ms. Farruggio likely knew.

20. Regarding WV's evaluation in 2007, Parent did not know at the time that the District's procedure for performing an evaluation for autism consisted of a referral to evaluators outside of school—e.g. a medical doctor or someone with a similar level of expertise,-- and that the District's usual psychologists or speech and language pathologists was not recognized by the District and possessing such expertise.

21. Notwithstanding the lack of expertise among its usual evaluators, Ms. Farruggio decided not to make the referral to such a qualified expert and, instead, determined herself that the results of WV's speech and language evaluation indicated that WV did not have autism.

22. Ms. Farruggio did not indicate she possessed the license or certification to make or refute a diagnosis of autism, nor did the evaluations indicate that she performed any of them or that she rendered any clinical judgment.

23. Ms. Farruggio did not inform Parent—by PWN or otherwise-- that Parent's request for a formal evaluation for Asperger syndrome had been essentially denied and that WV had not been assessed by an evaluator with the District's requisite level of expertise to confirm or refute his diagnosis of autism/Asperger syndrome.

24. Parent only later learned, during a due process hearing in February 2019, of the absence of a qualified expert evaluator for WV's autism during the District's eligibility determination in 2007.

25. The 2007 CSE informed Parent that WV scored highly in his tests and that the CSE deemed WV not to be a student with an educational disability under the IDEA.

26. Instead of an IEP, the District provided WV speech therapy through an accommodation plan under Section 504 for the 2007-08 SY.

27. Parent believed, therefore, that the District did deem WV to have a disability—having been deemed eligible for services under Section 504.

28. However, Parent believed that WV failed to meet the IDEA's co-requisite criterion that he demonstrate a need for special instruction.

29. Parent consented to the District's recommendations, unaware that WV's evaluation had been incomplete in light of the absence of an evaluator qualified to confirm or refute the diagnosis of Asperger syndrome/Autism.

30. Parent would have questioned the accuracy of the District's determination—that WV did not need special instruction-- had it been revealed at the time that the evaluators did not possess the required expertise to fully evaluate WV in all areas of need.

31. Furthermore, Parent was unaware that, under New York Education Law, the definition of special education included related services alone, such as the speech and language therapy WV received under Section 504.

32. Therefore, in 2007 WV had actually remained statutorily eligible for an IEP, but the CSE had misinformed Parent regarding that eligibility.

33. In January 2008, the District declassified WV altogether and discontinued all services.

34. In elementary school, WV passed his classes and was promoted from grade to grade notwithstanding his need for prompting and extra guidance to complete assigned tasks.

35. WV's second grade teacher, Mona Sussman, was concerned enough to perform a screening test to gauge WV's attentiveness and informed Parent that WV only got 3 out of 10 questions correct on a brief screening she performed.

36. Parent had WV undergo medical evaluations for attention deficit—including audiological testing for auditory processing difficulties and a consultation with a sleep specialist.

37. As part of the medical evaluation, Ms. Sussman completed a Conner's Rating Scale for WV, but failed to initiate a referral to the CSE for a formal evaluation by the school, notwithstanding her own concerns as well as Parent's.

38. Ms. Sussman's failure to make a referral for a formal evaluation served to reinforce Parent's understanding at the time, from her past experience advocating for both MV and WV, that, because WV was doing well in subject matter conventionally deemed "academic"—e.g. reading, writing, and Math— WV would not have qualified for special education.

39. When he reached middle school, however, WV's difficulties completing assignments in a timely manner became more significant.

40. Furthermore, WV's difficulties were exacerbated by manifestations of Crohn's Disease—a gastrointestinal condition that substantially limited major life activities pertaining to digestion.

41. For failing to turn in his homework, to come to class prepared, or to make up missed work due to absences due to illness, WV received deductions in his grade and was subjected to disciplinary measures such as detentions—criticism to which WV was extremely sensitive.

42. In December 2013, Parent informed WV's guidance counselor, Kathy Postma, of WV's medical diagnosis as well as his history of autism and past classification under the CPSE, but the District made no offers to provide accommodations under section 504 or to initiate an evaluation under the IDEA.

43. Although not reflected in his report card grades, WV qualified for the gifted and talented programs offered by Johns Hopkins University-Center for Talented Youth. (JHU-CTY)—a program available only by nomination to students who achieve a score above the 95th percentile in a nationally normed test.

44. WV's testing at JHU-CTY ranked with high honors—i.e. he scored in the top 30% among even the already select group of nominees who tested.

45. While WV was evidently strong in the subjects of Math and Science, WV was not selected to participate in the school's accelerated Math track, the initial determination for which was made prior to 7th grade.

46. It bears noting that the District's method of determining eligibility for Honors and Advanced Placement courses in high school relies on points earned from such advanced classes. Thus, placing in accelerated classes while in middle school puts a student in a position of advantage in high school.

47. WV's failure to qualify for such classes in middle school, notwithstanding his ability to handle the work, impacted opportunities available to him later, such that he needed to make additional effort in order to earn a place in Honors and Advanced Placement classes.

48. In middle school, WV also started manifesting depressed mood. For every school year from 2013 to 2016, WV experienced an episode in school that required an evaluation by the suicide risk management team, which recommended that WV get a clearance to return to school, due to concerns regarding his safety in school.

49. WV started seeing private psychiatrists and a private psychologist with whom the school staff communicated and who shared with school personnel WV's diagnoses and need for medication.

50. Because WV's teachers repeatedly emailed Parent to inform her of missing school work, WV's inability to complete such school work became a source of conflict between WV and Parent and emotional distress for both.

51. As a result of such conflict, WV's private psychologist, Dr. Alan Supraner, advised Parent to refrain from addressing such issues with WV.

52. Parent's withdrawal of her own intervention placed WV at a high risk for failing his classes and on or about December 2014 or January 2015, she shared her concern with WV's guidance counselor, Ann Marie Winslow and school psychologist Nicole Fernandes.

53. However, instead of referring WV to the CSE for an evaluation for a disability that may require special instruction and/or related services, the District offered WV school based Dialectical Behavior Therapy (DBT)—a form of counseling available to both disabled and non-disabled students.

54. District personnel failed to inform Parent at the time that the DBT program was actually a Response to Intervention (RTI) program—information that Ms. Farruggio revealed only during her April 2018 testimony.

55. While the District's referral to an RTI program evidently acknowledged that WV may require special instruction, when Parent did inquire about the possibility that MV may again qualify for special education, Fernandes informed Parent that WV would not qualify since he was only receiving a related service.

56. Notwithstanding Ms. Farruggio's purported designation of DBT as an RTI program, the District staff testified that they did not routinely perform progress monitoring of students in DBT.

57. Thus the District use of DBT as RTI violated State's guidelines and the District's own policy pertaining to RTI, as, absent progress monitoring, DBT was evidently not designed to determine whether or not a student actually responded to intervention.

58. In WV's case, the purported RTI only served to delay the District's obligation to evaluate WV under the Child Find provisions of both the IDEA and Section 504.

59. In April 29, 2015, when WV's school performance had deteriorated to the point that he risked actually failing a subject, Parent initiated a referral to the CSE requesting a formal evaluation for a disability and WV's need for special education.

60. Before the evaluation can be completed, WV experienced another emotional episode, in response to him getting detention for putting his head down on his desk during class.

61. The school's suicide risk assessment team again sent him home for further evaluation and required Parent to obtain clearance for WV prior to his return to school.

62. WV was hospitalized for a week and discharged from the hospital with multiple diagnoses including Major Depression and Pervasive Developmental Disorder.

63.  In a CSE meeting chaired by Susan Seda, the Asst. Director of Special Education, and held on June 25, 2015, the CSE found WV to be eligible for IEP services under a classification of Emotional Disturbance.

64.  During the CSE meeting, Parent also informed the CSE of WV's behaviors that were attributed to autism—e.g. his rigidity and how his lack of co-operation may be exacerbated by stressors such as hunger or sleepiness or embarrassment.

65.  The CSE also discussed in detail WV's fatigue and dysregulated sleep cycle that contributed to his difficulties in school.

66.  Mary westbrook, the District's speech and language pathologist,  shared with the CSE how WV expressed to her that he felt so tired at times and that, due to such fatigue, he just had to put his head down on his desk.

67.  At the time, the CSE attributed WV's sleep disturbance to his emotional issues, thus acknowledging that the dysregulated sleep was somehow disability related.

68.  It bears noting that the District's Social History in 2015 erroneously indicated that WV was undergoing an evaluation for sleep apnea during that time—an error  that Parent later discovered and corrected in an affidavit presented during the February 2019 hearing.

69.  However, in light of the error—which  the District had evidently not considered to be an error in June 2015—the District had reason to suspect a sleep disorder that contributed to WV's academic difficulties.

70.  The District failed to clarify or further evaluate the possibility of an underlying sleep disorder in 2015.

71.  The June 2015 IEP provided no accommodations for WV's problems that arose from his dysregulated sleep, notwithstanding the CSE's acknowledgement of its link to WV's disability—i.e. his emotional disturbance..

72.  The CSE placed WV in the District's Emotional Support Program (ESP).

73.  Notwithstanding the interventions, WV continued to have difficulties with managing his work. He frequented the school's Health Office and spent more time in the ESP classroom than the ESP team deemed appropriate.

74.  Acts resulting in self injury, such as punching a wall and punching himself on his thigh, occurred in school, when staff were trying to convince him to return to class.

75.   On September 25, 2015, Parent sent an email to Dr. Thomas Fischer, the school psychologist who managed WV's case in the ESP, specifically requesting that the District perform a Functional Behavioral Assessment (FBA).

76. On September 29, after again being asked to take WV out of school due to his refusal to return to class, Parent spoke with Ms. Seda and asked the District for a Behavioral Intervention Plan (BIP)—a request she reiterated in a September 30 email.

77. Neither Dr. Fischer nor Ms. Seda denied her request, and it was Parent's understanding that the District had agreed.

78.   WV's failure to turn in work on time and his trips to either the ESP room or the health office persisted. On several occasions, a family member was called to take WV home.

79.   Dr. Thomas Fischer, the school psychologist managing WV as an ESP student, explained to Parent that school staff cannot be expected to continuously monitor WV when he did not go to his class, and that his demands for attention were compromising Dr. Fischer's as well as the school nurse's ability to tend to other students.

80.   On or about March 2016, Parent recognized that WV needed more support than the ESP was able to provide and informed the ESP team of her willingness to discuss alternative educational placements. She requested a CSE meeting to discuss options.

81.   However, prior to WV's removal from the mainstream, Parent requested to review WV's FBA and BIP, only to find that no FBA had ever been conducted, nor was there a specific BIP in place for WV.

82. Furthermore, there were no records regarding methods or interventions that the District staff already tried and which, evidently, failed to achieve the desired results that WV attend his classes and turn in his work regularly.

83.   Dr. Fischer and Ms. Seda provided different reasons for not performing the FBA at the time Parent requested one in September 2015, but neither had provided Parent any indication, much less a PWN, of their denial of her request.

84. Dr. Fischer attempted to blame Parent by informing her that the reason no FBA was performed was because she didn't provide consent, although the District never indicated that a new consent was necessary.

85.   Parent requested that a FBA be performed as soon as possible and provided a written consent for the procedure on March 18, 2016. It was Parent's understanding that the District would perform the FBA.

86. Notwithstanding Parent's request for a CSE meeting, the CSE did not convene.

87. Instead, Dr. Fischer informed Parent that he discussed WV with Ms. Farruggio Ms. Seda. Dr. Fischer explained that the two recommended that WV attend either Intensive Outpatient Therapy (IOP) or Intensive Day Treatment (IDT).

88. It bears noting that the District offered no report from a psychiatrist nor made recommendation for a psychiatric consultation prior to offering WV such options for psychiatric treatment.

89. Since, after his discharge from his May 2015 hospitalization, WV's psychiatrists had deemed WV to be a poor candidate for IOP, Parent declined that option.

90. Because Parent was unfamiliar with IDT, she agreed to visit the program to gain more information about it.

91. Parent and WV visited IDT, accompanied by Dr. Fischer, on March 17, 2016.

92. While visiting IDT, Parent was surprised to hear Dr. Fischer label WV's autism as a "misdiagnosis."

93. Parent was further taken aback by the program's and Dr. Fischer's expectation that, without an IEP reflecting its provision, WV would then proceed with enrollment at IDT, which Ms. Seda had described as a "30-plus day treatment."

94. At the IDT office, Parent and Dr. Fischer had a heated verbal exchange regarding the absence of a FBA or any other record of interventions the District had attempted before recommending WV's removal from the mainstream.

95. Dr. Fischer characterized Parent as "obsessed" about records and expressed his irritation that, to Parent had forwarded to his "boss" – i.e. Ms. Seda—proof of her request for a FBA in the form of the September 25 email to Dr. Fischer specifically requesting a FBA.

96. Parent reasonably expected that a change in placement, such as a removal from the mainstream setting for 30-plus days, would be discussed by the CSE.

97. Parent chose not to enrolling WV in IDT at that time, and, instead, immediately contacted Ms. Seda with a request to convene the CSE.

98. In her March 18, 2016 emailed response to Parent, Ms. Seda informed Parent that the IEP will not be changed, so that a CSE meeting was not necessary.

99. On March 21, 2016, WV experienced another emotional breakdown accompanied by actual acts of self-injury.

100.   As recounted by Dr. Fischer to Parent, the incident started during first period on March 21, 2016, with WV's teacher, Ira Steinberg, and also Dr. Fischer, trying to get WV to sit up and do his work after WV had, once again, felt the need to put his head down on his desk during class.

101.   Dr. Fischer recounted that he and Mr. Steinberg removed WV's desk and chair from under him, and WV had stayed in place standing in the room with closed eyes and not speaking for the remainder of the first period and into the second period.

102.   Dr. Fischer recounted that, during third period, he found WV once again going to the health office instead of his Math class.

103.   Dr. Fischer recounted how he  he physically propelled WV from the first floor health office to his 3rd floor Math class, by holding onto WV's shoulder and/or the clothing on his back.

104.   Dr. Fischer recounted how WV initially did not speak, but he resisted Dr. Fischer's efforts by walking extremely slowly, leaning back against his hand instead of moving forward,  and attempting to shake or shrug Dr. Fischer's hand away from his person—acts which should have indicated to Dr. Fischer WV's resistance and aversion to being physically compelled in such a manner.

105.   Dr. Fischer recounted that, just before reaching the classroom, WV had a meltdown that included acts of self-injury—banging his head on a locker, punching a wall, punching himself in the face-- as well as verbalized intent to commit further self-injury when he gets home. WV also said that he needed a break.

106.   Dr. Fischer recounted that WV's Math teacher, Marie May, who evidently heard the commotion came out of her class to calm WV down and managed to convince WV to go to the health office.

107.   Only then did Dr. Fischer call WV's parents.

108.   It bears noting that, when Parent arrived at school to pick WV up from the health office, WV was fast asleep in the cot there.

109.   It also bears noting that, when discussing WV's problem behaviors during the June 2015 CSE meeting, Dr. Fischer had reassured Parent that the school would not get physical with WV:

> "We will avoid power struggles. We're empathic. We don't get in kids' faces. I mean unless it's a dangerous situation. But we're not going be physical with him. We're not going to try to pull him up out of a chair if he's sleeping, that sort of thing."

110.   When, during the 2018 hearing,  Dr. Fischer was asked his reasons for taking such a  course of action with WV, Dr. Fischer responded that he so acted because the transfer to IDT had not worked out.

111.   When Dr. Fischer informed Parent of the incident, Parent asked Dr. Fischer to write a note of the incident for her to take to the doctor, and Dr. Fischer initially agreed to do so.

112.  However, when Parent arrived to pick up WV and inquire about the details surrounding the incident, Dr. Fischer informed her he will not be providing a note, as his superior, Jeanne Farruggio, had instructed him not to write one.

113.  Parent reminded Dr. Fischer that she had already signed a consent for a FBA, and the incident he just witnessed required such a FBA.  Parent therefore requested the note which would be used for the FBA.

114.  Dr. Fischer still refused to provide a note pertaining to the incident, so Parent immediately wrote down what Dr. Fischer had verbally recounted to her, so she can relay it to the Emergency Room doctor.

115.  WV was evaluated in a hospital emergency room in Danbury Hospital and, again, on the following day, by his outpatient counselor at St. Vincent Hospital outpatient department.  Both deemed WV not to need hospitalization at that time, but that he needed an IEP revision.

116.  However, following the incident, WV refused to return to his home school, as he was humiliated and anxious about facing his classmates.

117.  WV was so humiliated that he even refused to continue to attend religious education because his classmates in Math, who likely witnessed his meltdown, attended the same religious education class.

118.  Thus, Parent had to homeschool him regarding his religious education requirements, so he can participate in his Confirmation scheduled for later that year.

119.  Parent informed the District of her intent to unilaterally place WV in another school because of her concern for his escalating behaviors in the District school and the absence of any data that can be used to formulate a plan to prevent recurrence of potential harmful behavior.

120.  Parent consulted an attorney to discuss options for WV and the feasibility of a private placement.

121.  One school—the Robert Louis Stevenson School—appeared initially interested in admitting WV but, understandably, withdrew upon learning from Parent of the episode of self-injury and the uncertainty that surrounded the possibility of recurrence.

122. In her search for an alternative school for MV, Parent requested the assistance of Dr. Fischer and teacher Marie May, because admissions department of potential school placements wished to speak to the home school staff regarding WV's difficulties.

123. Instead of a response from Dr. Fischer or Ms. May, however, Parent received a notification from Ms. Farruggio, who stated, as a blanket statement for the entire school:

> "I understand that you have reached out to several staff members for references with respect to your search for a private program for William. Please know that our staff will not be available to assist you with your request. We will, however, provide copies to you of any of William's educational records upon your request."

124. It bears noting, however, that WV's records do not contain the relevant details regarding the circumstances under which WV's self-injury occurred, as Dr. Fischer refused to write a note that contained the information necessary for the formulation of an appropriate behavior intervention plan..

125. Fortunately, staff at Westfield Day School deemed Parent's account of the events credible and accepted WV for admission.

126. Parent placed WV in Westfield Day School, a small therapeutic school that offered individualized instruction as well as counseling. Westfield also accommodated WV's fatigue and need for a late start and occasional naps due to his dysregulated sleep.

127. On April 20, 2016, the CSE convened to discuss WV's placement. The CSE proposed a FBA but did not include among the target behaviors the need to prevent thoughts and acts of self-injury.

128. Dr. Fischer failed to discuss with the CSE the circumstances that may have contributed to WV's meltdown and self-injury on March 21, 2016, notwithstanding his purported familiarity with autistic students taught using Applied Behavioral Analysis (ABA) and that method's reliance on the observation of antecedent events that may contribute to undesirable behavior.

129. Dr. Fischer was likely aware of the relevance of the circumstances antecedent to undesirable behavior in determining appropriate intervention to prevent recurrence, but nevertheless refused to share that information.

130. Given that even Dr. Fischer--who had expressed his intuitive knowledge that resorting to physical force would be inappropriate for WV--still resorted to such measures, it was evident that a formal BIP was necessary to inform other school staff who may deal with WV that the strategies utilized on March 21, 2016 should be specifically avoided, in light of WV's known adverse reaction to it.

131. However, rather than create a BIP to minimize WV's potential self-injury or the injury of others, school staff only remind Parent that WV had friends in the home school, in an attempt to persuade her to allow WV's return.

132. Dr. Fischer merely concluded "It'd be so good for [WV] to get past this. But the only way to do that is to get past it" and failed to provide specific preventive measures to ensure WV's safety.

133. As evidence of the District's bad faith and intent to conceal evidence of the incident, which should have required a FBA in light of the self-injury that occurred, the CSE unnecessarily deferred the FBA to until after WV returns to the middle school, notwithstanding Parent had already provided a written consent and Dr. Fischer had already observed an incident requiring a FBA.

134. Thus the District attempted to withhold from WV's records details that cast school staff in unfavorable light but which are nevertheless necessary to minimize the risk of a recurrent and potentially more serious episode for WV.

135. Where Dr. Fischer explained that the District had recommended IDT for WV as a less intense form of "hospitalization" and where Ms. Farruggio opined that WV can return to the ESP "once stable," it was evident that the CSE should have contemplated a placement other than the home school's ESP at the time of the April 2016 CSE meeting.

136. Clearly, Ms. Farruggio knew WV should not be placed back in the ESP, as evident in her solicitation of Parent's request for referrals to State approved schools.

137. Nevertheless, in light of the lack of vacancy in IDT, Ms. Farruggio steered the CSE towards a recommendation on the IEP that WV return to the same unsuccessful placement in the District's ESP, in which WV demonstrated escalating self-injurious behavior.

138. Furthermore, Ms. Farruggio made that recommendation without a proposed re-evaluation of WV *prior* to his return, without a hypothesis of the reason for WV's alarming behavior, and without providing any changes in his IEP that may reduce the likelihood of WV's self-injury, or his frequent visits to the health office, or his difficulty turning in school work.

139. In light of Ms. Farruggio's authority, no other CSE member beside Parent contested Ms. Farruggio's decision, notwithstanding its evident irrationality.

140. Although the District later sent out referral packets to State approved schools that may be willing to accept WV, those records contained inadequate information to sufficiently alert the receiving schools to the extent of problem behaviors that WV has exhibited and could potentially still exhibit when triggered.

141. Moreover, the referrals failed to alert the receiving schools to the trigger already observed by Dr. Fischer.

142.    Thus, the District demonstrated its reckless disregard or deliberate indifference to subjecting WV to State created danger.

143.    Parent rejected the CSE's proposed program and, instead, continued WV's placement in Westfield Day School for the remainder of the 2015-16 school year.

144.    Parent also requested an Independent Educational Evaluation (IEE), which confirmed that WV's manifestations were consistent with a diagnosis of Autism and brought attention to WV's weaknesses in effective communication skills and other coping skills--deficits rooted in WV's autism.

145.    The District refused to reimburse Parent for the full cost of the IEE but failed to initiate a due process hearing to defend its decision not to do so.

146.    Because staff at Westfield also observed WV to have a genuine difficulty staying awake during school hours, WV underwent a sleep study that diagnosed him with sleep apnea—a condition which subjects WV to chronic sleep deprivation unless he uses a Continuous or Bilevel Positive Airway Pressure (CPAP or BiPAP) machine while sleeping.

147. The District ultimately agreed to place WV in Karafin School-- a small therapeutic school similar to Westfield-- for the 2016-17 SY, but it failed to provide him adequate accommodation for his recently discovered sleep apnea.

148.    Although Karafin school had a start time that was later than other schools, the potential benefit was negated by Ms. Farruggio's refusal to provide as a related service to WV a late bus pick-up—an accommodation WV needed for his sleep apnea.

149. Because stressors in the morning had been known to negatively impact the rest of WV's school day, Parent had to look for alternative transportation to minimize conflicts with WV that arose when he was woken up too early.

150. Parent informed the CSE that she could not drive WV to school because she also had to drive WV's brother, MV, to his own private placement in New Haven, CT in the mornings.

151. Because the District refused to guarantee transportation with a later pick-up time as a related service for WV, Parent was forced into the situation of having to either make herself or another family member available to take WV to school, in order to avoid WV missing the entire day of school—circumstances that caused Parent frustration, conflict with family members, the stress of juggling multiple commuters in the morning, and emotional distress.

152. When WV improved and requested to return to the mainstream setting, the CSE failed to take adequate measures to return WV to the mainstream as his least restrictive environment.

153. WV's private counselors, Dr. Michelle Dunn and Larry Harris, opined that WV can return provided that he demonstrated his ability to cope with the mainstream work load utilizing the supports available in the mainstream.

154. During CSE meetings held in February 2017 and June 2017, Parent requested that WV's goals specifically identify the barriers that prevent him from turning in homework and instruct him in strategies to overcome those barriers, to facilitate his return to the mainstream educational setting.

155. However, as stated during the June 2017 CSE meeting by WV's counselor at Karafin, Marcus Kozien, the provision of homework load similar to mainstream classes ran contrary to the structure and style of Karafin's programs.

156. Thus Parent requested that WV be provided supplemental work that would allow him the opportunity to demonstrate to what extent he can cope with mainstream workload, while also identifying the supports he may still need.

157. The CSE refused to hear Parent's full proposal.

158. Later, during the due process hearing, the District would mischaracterize her intent as an attempt to overburden WV with the curriculum of two schools.

159. However, Parent had only requested work packets representative of a mainstream workload so that WV can access them to the extent that he was willing or able, and solely for the purpose of demonstrating his progress, but which would not need to be graded.

160. Thus the CSE meetings held February 2017 and June 2017 failed to address WV's need for exposure to mainstream programming and the possibility of WV attending a general education setting, as the least restrictive environment (LRE), with supports.

161. The CSE failed to discuss WV's need for mainstreaming and, therefore, the IEP for the 2017-18 SY failed to address WV's need in that regard.

162. Parent gave the June 2017 CSE notice that, if the IEP did not provide goals geared towards WV's enabling WV to succeed in handling a mainstream workload, she will be forced to supplement WV's classes in Karafin with privately funded counseling and training, and she will request reimbursement.

163. Parent then obtained for WV counseling services with Dr. Dunn and Mr. Harris for the remainder of the school year and the summer of 2017 in order to acclimate WV to the type of work he will encounter in the mainstream.

## History of Administrative Procedures Pertaining to WV

164. On September 24, 2017, Parent filed a due process complaint *pro se*.

165. In October 2017, she reviewed the complaint with her attorney and submitted an amended version on October 2, 2017. (WDPC1)

166. In her complaint, Parent alleged, among others, that the District's denied WV a free and appropriate public education (FAPE) for the 2015-16 and 2017-18 school years, that the District's failed to meet its obligations under the Child Find provisions of both the IDEA and Section 504 prior to Parent's referral to the CSE for evaluation on April 29, 2015.

167. Parent's complaint included allegations that the District violated Section 504, the ADA, and Constitutional law.

168. Parent requested full reimbursement for WV's tuition at Westfield, the full cost of the 2015 IEE, and the full cost of transportation to Karafin.

169. In addition, Parent requested whatever compensatory services the IHO may deem appropriate.

170. The District convened a resolution meeting in October 2017, during which Parent, appearing without an attorney, and District representatives Ms. Farruggio and Ms. Seda, agreed to terms for withdrawing her administrative complaint—i.e. that the District will reimburse WV's tuition at Westfield Day School and fully fund WV's IEE in the form of his Neuropsychological evaluation.

171. While Parent's agreed to those terms, the District's attorney, Carol Melnick, precluded settlement by insisting that Parent also waive her rights to non-IDEA claims and to any future claims that may arise during the remainder of the 2017-18 school year, notwithstanding the fact that the school year in question had just started.

172. Parent refused to waive her rights, as demanded by District's counsel.

173. During the hearing, the District refused to include Section 504 violations in the scope of the impartial hearing, in accordance with its stated policy of not addressing Section 504 matters outside of its own administrative procedures.

174. The IHO deferred to the District's policy and excluded Section 504 claims from the scope of the hearing.

175. The District's Board of Education failed to investigate and further address, through its own administrative procedures, the section 504 violations alleged in the complaint, notwithstanding the notice it was given through Parent's impartial hearing request and notwithstanding the participation in the hearing process of its Section 504 co-ordinator, Jeanne Farruggio.

176. Pursuant to Parent's due process complaint and request that WV transfer to the mainstream during that school year, the District convened a CSE meeting on November 30, 2017.

177. Parent presented a letter from Dr. Michelle Dunn, who worked with WV over the summer and during the first quarter of the 2017-18 school year. The letter described WV's motivation to return to the mainstream, the work he did outside of Karafin's routine assignments to showcase his readiness to do so, and the accommodations he would still need to succeed in the mainstream, as his least restrictive environment.

178. In light of the evidence presented, the CSE agreed to have WV return to the mainstream high school, with supports, during the second half of the school year.

179. To effectuate the transfer of WV's records from his private school to the District's high school after an out-of-District private placement, Parent was required to complete and file for WV's registration in the high school anew.

180. Although WV's transition to the mainstream was successful to the extent that he attended his classes and performed well in his graded subjects, Parent and school staff continued to disagree on how to remedy WV's difficulty with completing his schoolwork in a timely manner.

181. A FBA and BIP eventually performed by school staff in April 2018 failed to address these problems that Parent specifically identified in providing her consent for the evaluation.

182. It bears noting that Parent's due process complaints on WV's behalf coincided with the impartial hearing for WV's brother, MV.

183. In the course of Parent's research, prompted by Ms. Farruggio's testimony regarding curriculum modifications made for MV, Parent discovered the *Regents Policy Statement on Middle-Level Education, Supporting Young Adolescents July 2003*[1] and other related documents that described the District's obligation to ensure that students be provided instruction that would enable them to achieve all 28 learning standards set by New York state, including those for non-tested content.[2]

---

[1] The *Regents Policy Statement on Middle-Level Education, Supporting Young Adolescents July 2003* may be accessed here http://www.nysed.gov/curriculum-instruction/middle-level-education-history-and-policy
[2] The Middle Level Achievement Checklist may be accessed here: http://www.nysed.gov/curriculum-instruction/middle-level-education-achievement-checklist

184.    In light of her discovery, on or about December 2017, Parent filed a second due process complaint (WDPC2), on June 12, 2018, based on the District's failure to acknowledge the CDOS Learning Standards (CDOS LS) as a component of the general curriculum and the District's failure to recognize WV's deficits in the areas of organization and self-management as signs of his need for special instruction.

185.    Although initially dismissed by the IHO as untimely, the SRO reversed the IHO's decision and remanded the matter back to the IHO for development of the hearing record to support the District's contention that the claims made were outside the statue of limitations (SOL).

186.    The IHO consolidated DPC2 with the amended DPC1.

187.    During the hearings, the District staff attempted to characterize Parent as one who prioritized WV's grades over his emotional well-being and attempted to blame her as the source of WV's emotional distress.

188.    As District's counsel, Ms. Melnick misrepresented facts by presenting select parts of email exchanges that gave the impression that Parent was ignoring WV's purported anxiety and withholding Parent's responses to the conversation that indicated otherwise.

189.    Furthermore, the District showcased as negative Parent's attempts to place WV—an academically gifted student—into the accelerated courses, notwithstanding the fact that WV himself wanted placement in such courses.

190.    The hearing record was also notable for revelations such as:

   a. Contrary to Parent's understanding that the District acknowledged WV's autism as a disability— which formed the basis of his 2007 Section 504 plan—the CSE never believed WV to have autism

   b. Contrary to Parent's belief that the District performed, in 2007, an evaluation for Asperger Syndrome on WV but deemed him to be too high functioning to need special education, the CSE had never performed the evaluation, but failed to provide Parent a PWN informing her of the denial of her request.

   c. Ms. Farruggio considers DBT to be a RTI program, but the school staff do not perform the progress monitoring that is a hallmark of the RTI process and which would serve to indicate whether or not the student is actually responding to intervention. Thus, the District's purported RTI program only served to excuse the CSE from its affirmative obligation, under Child Find, to perform a formal evaluation of WV.

   d. Outside of Parent's request for a FBA, Dr. Fischer never considered performing one for WV, notwithstanding the fact that District recommended WV's enrollment in IDT—a removal from the mainstream setting that is an indication for a FBA, as were his self-injurious behavior and behaviors that interfered with learning.

e. A FBA is so rarely performed by the District that Dr. Fischer estimates that only five may have been performed in the last 15 years.

f. Dr. Fischer did not consider manifestations of autism to be a major contributing factor to WV's behavior problems.

g. Dr. Fischer's referral note to IDT for WV failed to mention that WV had autism.

191. It bears noting that, Parent's attorney withdrew from the case due to illness, after having provided consultation to Parent regarding WV since March 2016 and representation in the due process procedures from October 2017 through January 2019.

192.  Parent proceeded *pro se* on the last hearing date, February 26, 2019.

193.  Guided by the case records, Parent submitted her post-hearing brief on April 3, 2019.

194. In a decision released on May 9, 2019, the IHO held that the District denied WV FAPE during the 2015-16 SY based upon finding, among others, that it failed to perform a FBA when there was an evident need to do so and in light of Parent's request for one.

195.  The IHO awarded Parent reimbursement for tuition at Westfield Day School, as well as for the full cost of the IEE.

196. In light of the District's past failure to assess and address WV's autism-related behaviors, the IHO awarded Parent an evaluation by a board-certified behavior analyst (BCBA) to address WV's residual deficits that will interfere with WV's learning in both the high school and post-secondary setting and to make recommendations for proper intervention.

197.  However, the IHO denied Parent's request for reimbursement for the full cost of transportation to Karafin and found claims based on events prior to Parent's April 29, 2015 CSE referral to be time barred.

198. In addition, the IHO found that the District offered WV FAPE for the 2017-18 SY, since Karafin "eventually" did give WV extra work outside of its routine assignments, although the IEP failed to indicate the provision of such work, as Parent had requested.

199.  Parent requested a review by the SRO of the IHO's decision to deny full reimbursement for WV's transportation to Karafin. Parent also disagreed with the IHO's finding that the District's IEP for the 2017-18 SY offered WV FAPE, in light of the IHO's reliance on restrospective evidence that Karafin "eventually" provided WV extra work.

200.  Parent also disagreed with the IHO's seeming acceptance of the District's decision to forego a FBA pertaining to WV's self-injurious behavior in March 2016 and asserted that such an unnecessary delay amounted to gross misjudgment on the part of the District.

201.  The District cross-appealed, requesting a review of the SRO's decision that the District denied WV FAPE for the 2015-16 SY and the SRO's award of reimbursement for tuition at Westfield as well as for the IEE.  The District likewise appealed the IHO's decision to award Parent an evaluation by the BCBA.

202.  In a decision dated July 19, 2019, the SRO upheld the IHO's decisions--finding that the District denied WV FAPE for the 2015-16 SY and awarding full reimbursement for the tuition at Westfield and for the IEE, as well as supporting the IHO's award of an evaluation by the BCBA.

203.  In addition the SRO reversed the IHO's ruling regarding WV's transportation to Karafin and awarded Parent full reimbursement for the costs she incurred for the service.

204.  The District abided by the SRO's decisions and issued reimbursement.


## STATEMENTS OF CAUSES OF ACTION


### Count I
### Request for Judicial Review of Select Parts of Decision No. 19-053
### Made by a New York State Review Officer (SRO)
(Parent, individually on her own behalf, and on behalf of WV against the District)


205.  Plaintiffs restate the preceding paragraphs as if set forth in full herein.

206.  Parent and WV are parties aggrieved by some findings by the SRO in Decision No. 19-053 which were erroneous as a matter of law, as set forth below.

**Statute of Limitations  Regarding Child Find and RTI**

207. Regarding IDEA procedures and remedies, Plaintiffs assert that claims that have accrued prior to the date of this appeal have been exhausted and remedies under the IDEA have been obtained to the extent that further exhaustion of administrative procedures is futile.

208.  However, Plaintiffs are aggrieved by the SRO's and IHO's findings with respect to the SOL in the context that the adverse findings may impact Plaintiffs' claims based on statutes or law other than the IDEA and that require exhaustion under the IDEA.

209.  The SRO erred in finding time barred Parent's claims of the District's violation of the Child Find mandate, premised on the District's duty to evaluate WV's deficits in the  CDOS LS and functional skills.

210. The SRO and IHO erred in failing to find that the District failed to meet its burden of proof with respect to determining the accrual date of Parent's claims.

211. The IHO erred in finding, *sua sponte*, that Parent should have filed a due process complaint no later than 2 years after her April 29, 2015 referral to the CSE.

212. The SRO and IHO erred in finding that, notwithstanding MV's ability to pass his graded subjects prior to Parent's April 29, 2015 CSE referral, Parent knew or should have known that the District had been remiss in its failure to evaluate WV for special education prior to that date.

213. The SRO and IHO erred in failing to recognize that, in April 2015, Parent understood WV to need special instruction in functional skills as an accommodation—i.e. a tool that would enable him to improve his performance in his graded subjects.

214. The SRO and IHO erred in failing to recognize that such understanding—of a need for an accommodation-- would not have triggered a need for a CSE referral had WV been achieving passing grades, as he was previously doing.

215. The SRO and IHO erred in failing to find that Parent justifiably believed she had no choice but to wait until WV was actually at risk of failing a graded subject—e.g. ELA-- before she initiated referral to the CSE for evaluation.

216. The SRO and IHO erred in failing to find that, in April 2015, Parent remained unaware of the District's obligation to nevertheless provide WV special instruction in the organization and self-management skills which he lacked--even if there were no signs of imminent failure in a graded subject--because such functional skills, in and of themselves, constitute curriculum objectives under the CDOS LS.

217. Therefore the SRO and IHO erred in failing to find that the date Parent "knew or should have known" that WV should have been referred to the CSE was not April 2015 but on or about December 2017, when she discovered the *Regents Policy Statement on Middle-Level Education, Supporting Young Adolescents July 2003.*[3]

218. The SRO erred in her determination that Parent should have known, in 2007, that the District's evaluations were inadequate-- in that a test for autism was not included in the District's consent for WV's evaluation-- when there is no evidence that Parent has the requisite expertise that would enable her to detect that deficiency.

---

[3]The document describes the District's obligation to ensure a student's achievement of all 28 of the State's learning standards, including the CDOS LS.

219. The SRO failed to recognize that, as the evaluation from the Montefiore Center for Autism indicates, there is no single test entitled "Test for Autism" that a non-expert like Parent should have been able to readily identify as missing from a list of proposed assessments.

220. The SRO erred in failing to recognize that the crucial instrument in the evaluation for autism is not a particular test, but rather the involvement of an expert evaluator whose clinical eye can detect patterns and elicit behaviors during testing that would justify the diagnosis of autism.

221. In light of Parent's discovery--through Ms. Farruggio's April 2018 testimony--that the DBT program constituted a Response to Intervention (RTI) program, the SRO erred in finding as time barred Parent's claims regarding RTI.

222. The SRO and IHO erred in failing to find that the District's use of its DBT program as RTI constituted a violation of the IDEA and related State laws, in that the District staff who implemented the DBT program testified that they performed no progress monitoring, when such progress monitoring and data collection is a hallmark of RTI.

## February 2017 and June 2017 IEPs

223. The SRO failed to properly find that the CSE denied WV a FAPE by not creating an IEP that would have enabled WV to transition into the mainstream classroom as the LRE for the 2017-18 SY.

224. The SRO and IHO failed to properly find that, in light of the progress WV made, the February 2017 and June 2017 CSEs failed to consider less restrictive placement or one that offered WV mainstreaming opportunities.

225. The SRO and IHO erred in failing to find that the CSE's refusal to formulate an IEP goal that aimed to enable WV to manage a mainstream student's homework load was not appropriate in light of his circumstances—i.e. that the said functional skill is WV's specific area of need.

226. The SRO erred in failing to properly find that the IHO impermissibly relied on retrospective evidence when she reasoned that the IEP provided WV a FAPE because Karafin School "eventually" did provide WV the extra homework that WV asked for.

227. The SRO and IHO erred in basing their determination of FAPE on what WV received, and not what the IEP indicated at the time it was formulated.

228. The SRO and IHO erred in failing to find that, in light of WV's progress and his knowledge that he no longer had to return to the hostile environment that the middle school was for him, the benefits Karafin had to offer failed to outweigh the adverse impact of WV's awareness of his segregation from his non-disabled friends.

229.   The SRO erred in failing to recognize that the increased motivation that WV demonstrated at the beginning of the 2017-18 SY, and for which reason he was able to return to the mainstream as his LRE in January 2018, resulted from privately funded counseling and training that Dr. Dunn and Larry Harris provided from the end of the 2016-17 school year, over the summer, and into the 2017-18 school year.

230.   The SRO erred in failing to find appropriate reimbursement for Dr. Dunn's and Mr. Harris's services that allowed WV to return to the LRE during the 2017-18 SY.

Regarding Placement in IDT

231.   The SRO erred in failing to rule on Parent's assertion that the IHO erred in failing to find a violation of FAPE in the District's decision to recommend WV's enrollment in IDT without involvement of the CSE.

232.   The issue-- of whether or not a removal to a 30-plus day program constitutes a change and placement and requires a determination by a CSE—deserves a de novo review by this honorable court.

Regarding an Evaluation for Sleep Disorder

233.   The IHO erred in her determination that the District does not have a duty to evaluate for a sleep disorder, when there is evidence that dysregulated sleep adversely impacted WV's academic performance.

234.   This issue of whether or not the District should have initiated a medical diagnostic evaluation, in light of WV's circumstances, also deserves a de novo review by this honorable court.

Regarding the District's Gross Misjudgment

235.   To the extent that non-IDEA claims may be impacted by the IHO's and the SRO's failure to find that the District acted with bad faith and gross misjudgment or with deliberate indifference to WV's and Parent's rights, Parent and WV also contest the IHO's rationalization of the District's failure to perform a FBA during the 2015-16 SY—i.e. because WV did not return to the home school after his emotional breakdown on March 21, 2016.

236.   The IHO erred in failing to realize that the District had sufficient data to perform a FBA—in that Dr. Fischer and Mr. Steinberg witnessed the antecedent events that led to WV's episode of self-injury.

237.   The IHO erred in failing to find that the only factor that precluded the District from its obligation to perform a FBA to address WV's self-injurious behaviors was the irrational unwillingness of the District personnel to create a meaningful record upon which a behavior interventions plan can be based.

238. The SRO and IHO erred in failing to find as timely Parent's claims of denial of participation in decision-making based on Parent's discovery, during Ms. Farruggio's February 2019 testimony, that:

    a.  the District's 2007 evaluation by the CSE lacked the evaluation for Asperger Syndrome which Parent specifically requested,

    b.  that the District did not provide Parent a PWN explicitly stating the denial of her request, such that in the intervening years from 2007-2015 Parent believed the test was performed but WV proved to be too high functioning to need an IEP

    c.  that the individual who essentially made the determination that WV was not autistic was Ms. Farruggio, notwithstanding her lack of qualification to do so

239. The SRO and IHO erred in failing to find the District acted with gross misjudgment or reckless disregard of Parent's and WV's rights with respect to Parent's discoveries stated in Paragraph 181 above.

## COUNT II
### Request for Designation as the Prevailing Party in the Administrative Proceedings
(Parent, individually, and on behalf of WV against the District)

240. Based on the merits of their claims under the IDEA, Plaintiffs succeeded in obtaining all but one of the relief they sought, in that:

    a.  Both IHO and SRO awarded full reimbursement of tuition paid to Westfield Day School

    b.  Both IHO and SRO awarded full reimbursement for the Independent Educational Evaluation

    c.  Both IHO and SRO awarded an evaluation by a Board Certified Behavior Analyst to better address WV's residual deficits that pose obstacles to his current and postsecondary progress

    d.  The SRO reversed the IHO's decision and awarded Plaintiffs full reimbursement for whatever unpaid transportation costs Parent incurred as the result of the District's refusal to accommodate WV's sleep apnea.

241. Plaintiffs were able to obtain the relief they sought, or the comparable services, without having to waive their rights to file a complaint for the remainder of the 2017-18 SY or to file a complaint in court—as the District had demanded.

242. The administrative imprimatur from the IHO and SRO effected a material alteration of the legal relationship of the parties that is judicially enforceable, thus rendering Plaintiffs the prevailing party for the purpose of obtaining an award of reasonable attorney fees.

243. While Parent's attorney withdrew from representation prior to the last hearing date, Parent is nevertheless entitled to reasonable attorney fees and costs to cover payments she made in connection with

    a. the preparation and revision of the WDPC1 complaint
    b. pre-hearing preparations
    c. attendance during the WDPC1 hearings,
    d. the costs of travel to and from the WDPC1 hearings,
    e. opposition to the District's motion to dismiss WDPC2
    f. Request for Review by the SRO for WDPC2.

## COUNT III
## Discrimination
### §504 of the Rehabilitation Act of 1973, Title II of the Americans with Disabilities Act
(Parent on behalf of WV against the District)

244. Plaintiffs restate the preceding paragraphs as if set forth in full herein.

245. The District is a recipient of federal funds and is tasked with providing FAPE pursuant to section 504 of the RA and with enforcing the non-discrimination provisions of the ADA and section 504.

246. The District subjected WV to discrimination, based on his disabilities, and with deliberate indifference to his rights, as set forth below.

247. WV is a qualified individuals with disabilities under Section 504 and the ADA by virtue of having autism, ADHD, emotional disturbance, and obstructive sleep apnea and by having been a recipient of services through an IEP and Section 504 accommodation plans.

248. WV is substantially limited in the major life activities of effective communication, social skills, independent self-management, and sleeping.

249. WV was excluded from full participation in the District's services, programs, or activities, or was otherwise discriminated against by the District on the basis of his disabilities, as set forth below.

250. Such exclusion or discrimination was due to WV's disability in that the District denied Parent's requests for WV to receive the special instruction and accommodations he needed to overcome the obstacles imposed by his disabilities and to achieve the same high expectations the District set for its nondisabled students.

**Denial of WV's Access to the Full Scope and Benefit of the District's Curriculum that it Makes Available to Nondisabled students**

251.   The District discriminated against WV based on his disability by denying him FAPE under Section 504 in that the District failed to create for him an educational program that met his needs as adequately as the needs of non-disabled students are met, as set forth below.

252.   The District failed to apply to WV its self-declared mission to, among others, " maximize every student's potential…[and] to help young people attain the highest level of cognitive growth and critical analysis in all disciplines."[4]

253.   The District engaged in the continuing violation of Section 504 by implementing a policy/practice of failing to recognize the CDOS LS as a facet of the curriculum with its own grade level expectations of achievements.[5]

254.   By failing to specifically require, in its middle school and high school report cards, that teachers report on students' performance in the CDOS LS in the same way it requires reports of performance in graded subjects, the District perpetuated the misconception that functional skills are non-academic, notwithstanding the existence of learning standards that indicate otherwise.[6]

255.   Thus, the District failed to promptly initiate a referral for an evaluation for a Section 504 accommodations plan when WV failed to demonstrate achievement of grade level expectations in the CDOS LS.

256.   The District failed to provide the appropriate evaluations and explicit and direct instruction that WV needed to enable him to achieve the grade level CDOS Learning Standards that other students were able to achieve, but which WV was unable to access due to his disabilities.

257.   While nondisabled students of the District have access to accelerated and double accelerated Math and Science courses beginning in the middle school grades, WV was unable to access such programs because his deficient CDOS-based skills that resulted from his disabilities caused him to incur deductions for late submissions and prevented him from obtaining the grades that showcased his ability to handle the subject matter.

258.   Thus, WV was deprived of the opportunity to attain  as high a level of achievement in Science and Math  during middle school as that which was offered to his nondisabled peers, notwithstanding his ability to do so, had he been given appropriate and reasonable accommodations and special instruction to address his areas of need.

---

[4] Ardsley UFSD Board of Education Policy Manual – Mission Statement accessible through https://www.ardsleyschools.org/domain/54

[5] Information regarding the CDOS LS is accessible through http://www.nysed.gov/curriculum-instruction/career-development-and-occupational-studies-cdos-standards

[6] See http://www.p12.nysed.gov/cte/cdlearn/documents/cdoslea.pdf

259. Rather than provide WV the special instruction and accommodations he needed to remedy his deficiencies in completing his school work and other problems in self-management, school staff resorted to punitive measures such as detentions, which caused both Parent and WV emotional distress, in that homework completion became a source of conflict between them.

260. As a result, MV's grades did not reflect his true capabilities, as his disability precluded him from demonstrating his true achievements and eligibility for accelerated classes as early as other non-disabled students—i.e. during the middle school years..

261. Notwithstanding the June 2015 CSE's acknowledgement of WV's strengths in the areas of Math and Science, the CSE failed to provide the means by which WV can access the District's accelerated courses. Therefore, Parent had to supplement WV's curriculum with privately funded courses, such as Pre-Algebra, in order for WV to be placed in 8th grade Algebra.

## Creation of a Hostile Environment for WV

262. The District refused to recognize and evaluate WV's needs arising from his autism and sleep apnea.

263. The District refused to perform comprehensive evaluations to determine WV's needs for special instruction and for accommodations he needed on the basis of his disabilities, notwithstanding the information Parent provided regarding WV's pre-existing diagnoses to the personnel who interacted with WV.

264. Every emotional event from 2013 to 2015 that prompted school personnel to have WV picked up from school with instructions to his parents to obtain "clearance" before WV can return to school amounted to an admission that WV risked being denied access to his home school because of a disabling emotional condition.

265. The District's failure to evaluate him for the existence of a disability, in light of the school's communication with William's out-of-school psychiatrist that confirmed he had several diagnoses, and the failure to evaluate him for a need for accommodations or special instruction evinced the District's gross misjudgment and a deliberate indifference or a reckless disregard for WV's rights under the IDEA and Section 504 of the RA and the ADA.

266. The District's failure to maintain records or other documentation of such emotional events that necessitated WV's removal from school until he obtained "clearance" constituted gross misjudgment and deliberate indifference on the part of the District, especially when the event recurred in 2014 and the same risk assessment staff—i.e. school psychologist Nicole Fernandes—was called to intervene.

267. Because the events occurred in school – and only in school—and school staff bore witness to the circumstances under which they occurred, the school should have performed their own evaluation but failed to do so.

268. Although, the District purportedly provided DBT as a program under RTI, the program's designation as RTI—i.e. "response to intervention"-- was a farce, since the staff did not perform the progress monitoring that would have indicated whether or not WV was actually responding to intervention.

269. This contradiction evinced the school staff's reckless disregard to WV's right to an evaluation under Section 504 as well as the IDEA, especially in the event that he failed to respond to the intervention, and to their deliberate indifference to WV's rights to the reasonable accommodations he may have needed to ensure his equal access the District's programs provided for its non-disabled students.

270. Furthermore, referral to RTI was not a reasonable accommodation and made little sense under WV's circumstances, wherein he evidently already met the two prongs required for an IEP in that WV already carried a classifiable diagnosis—autism and emotional disturbance in the form of depression/anxiety-- and the referral to RTI only confirmed that the District suspected that he had a disability and that he needed services at the time of referral to DBT.

271. In light of the District's affirmative obligation, under the Child Find provisions of Section 504, to identify and evaluate students suspected of having a disability, the delay in WV's formal evaluation and classification was unjustified and constituted gross misjudgment on the part of the District.

272. Where WV's undesirable behaviors and expressed thoughts of self-injury placed him at risk of being removed from the District's school, an appropriate behavior intervention plan (BIP) that aimed to minimize that behavior would have been a reasonable accommodation that the District could have provided for WV's disability to allow WV to remain in the mainstream school.

273. Notwithstanding the clear need for a FBA and BIP for WV and Parent's calling the District's attention to that need, and her provision of a signed consent for the evaluation, the District refused to perform one, thus indicating the District's gross misjudgment and deliberate indifference to WV's rights to an appropriate evaluation under Section 504 as well as the IDEA.

274. Instead of performing a FBA or any other evaluation to determine if WV could benefit from reasonable accommodations, special instruction, and behavioral supports geared towards the manifestations and effects of his disabilities, the District continued to subject WV to punitive measures and other inappropriate behavioral interventions that caused WV humiliation and emotional distress.

275. While there are other evaluations —e.g. a consultation with a sleep specialist-- that could have shed light on the factors contributing to WV's problem behaviors, the District likewise failed to perform them, notwithstanding WV's manifestations that should have alerted school staff to WV's needs for such evaluations and for accommodations.

276. During the June 25, 2015 CSE meeting, speech and language pathologist Mary Westbrook shared with the CSE that, during her evaluation of WV, he expressed how, because of his

overwhelming fatigue, he had to put his head down on his desk. The CSE, which included Dr. Fischer, discussed how such fatigue and sleep dysregulation may be attributed to his emotional disturbance, thus acknowledging that behaviors such as putting his head down on his desk may be related to one disability that was already identified as of June 2015—emotional disturbance/depression/anxiety.

277. The District's failure to then create, during the June 2015 CSE meeting, a BIP or an accommodation plan for WV's dysregulated sleep and other behaviors misinterpreted as avoidance and manipulation, constituted gross misjudgment or deliberate indifference to WV's rights to such evaluation and accommodations to enable him to attend a mainstream school.

278. Dr. Fischer's comments during the June 25, 2015 CSE meeting—that school staff will avoid power struggles, will not get physical with WV, and will not try to move MV from his chair when he was sleeping or "that sort of thing"—indicate that he knew such interventions to be inappropriate for WV, but Dr. Fischer implemented them anyways, thus indicating his gross misjudgment, and his deliberate indifference or reckless disregard of WV's rights to appropriate behavioral interventions and accommodations.

279. The District's inappropriate behavioral interventions eventually resulted WV's episode of self-injurious behavior—foreseeable reactions in light of WV's previous acts of self-injury when forced to return to class-- and subsequent refusal to return to the hostile learning environment of the middle school in March 2016.

280. Notwithstanding school personnel's knowledge of WV's adverse reaction to the behavioral interventions used by Dr. Fischer and Mr. Steinberg, the April 2016 CSE refused to create a sufficiently detailed record of the March 21, 2016 incident, as is required by a FBA, to which the District had already agreed and Parent had already consented.

281. During the April 2016 CSE meeting, Dr. Fischer failed to forewarn other personnel who may have to deal with WV's behaviors in the future and failed to minimize recurrence of the event by including that goal for a FBA and by formulating a BIP that specifically warned against resorting to the measures which preceded the self-injury and likely precipitated it..

282. In referring WV to IDT, Dr. Fischer and Ms. Farruggio in effect acknowledged that the District's in-school program could not meet WV's needs, yet as CSE members-- with Ms. Farruggio acting as chairperson-- they steered the CSE towards WV's placement back to the in-school's ESP, knowing that it was inappropriate and that WV's injurious behaviors escalated while he attended that program.

283. The District's CSE placed WV back in the ESP without any significant change in the school records or his IEP to address the prevention of WV's self-injurious behaviors. Thus Dr. Fischer and Ms. Farruggio demonstrated their—and the District's—gross misjudgment and deliberate indifference to WV's rights to reasonable accommodations for WV that utilized appropriate and non-aversive behavior interventions.

284. Although the District did send referrals to non-district schools for the following school year, they did so by sending records and IEP's that merely stated that WV refused to return to school and failed to forewarn the receiving schools of the escalating potential injurious behaviors that WV had manifested and could manifest again.

285. Furthermore, the District chose to postpone the FBA until WV returned to the District, notwithstanding that no such delay was necessary, since Dr. Fischer and Mr. Steinberg had already witnessed an undesirable and potentially dangerous behavior that needed to be addressed immediately.

286. In light of the severity of WV's behaviors and the need to immediately take measures toward preventing such escalating acts of injury, it defies reason to defer the FBA until WV returned to the District school and to wait for the next potentially more severe event to happen when information is already available to develop a plan to prevent that next event.

287. By refusing to create such a FBA and BIP at the time when one was clearly needed—i.e. when WV was manifesting escalating self-injury prior to the April 2016 CSE meeting-- the District again demonstrated its gross misjudgment, deliberate indifference to WV's rights, and its reckless disregard for WV's aforementioned rights and to subjecting WV to State created danger.

**Denial of Accessible Transportation**

288. The District refused to accommodate WV's needs arising from his sleep apnea by providing a later transportation pick-up time or guaranteeing full reimbursement for the cost of private transportation that can accommodate a schedule more tolerable for WV, thus denying WV FAPE under section 504.

289. Given that WV would foreseeably miss the bus because of his sleep apnea, and that the distance from WV's home to Karafin precluded his walking there, the District's refusal to provide WV a later pick-up time is akin to refusal to sending a wheelchair bound student a bus with wheelchair access—i.e. the student would be unable to get on the bus due to his disability. Therefore the denial constituted deliberate indifference to his rights to access his education.

**Denial of Mainstream Education as the Least Restrictive Environment (LRE)**

290. Notwithstanding WV's improvement once appropriate interventions were implemented, the District's CSE meetings in February 2017 and in June 2017 failed to specifically target goals that would remedy WV's deficits in self-management skills in order for him to return to a non-segregated setting as his least restrictive environment (LRE).

291. Notwithstanding evidence that WV's placement separating him from his non-disabled friends posed additional emotional distress for him—in 9th grade, when the prospect of returning to the middle school was no longer a risk-- the CSE failed to create and implement a transition

plan for him to return to successfully return to the mainstream as the least restrictive environment for his continued education.

292. The District failed to provide WV opportunities for mainstreaming for the 2017-18 SY such as the re-entry plan which Ms. Farruggio offered for WV during the April 2016 CSE meeting, when WV attended Westfield

293. Providing WV work packets reflective of the workload of a mainstream student—such as those which the District would have provided WV had he enrolled in IDT-- is a reasonable accommodation that would allow WV opportunity to become acclimated to such a workload in order to return to the mainstream as soon as possible.

294. The District refusal to make such a reasonable accommodations available to WV for the 2017-18 SY in order to facilitate his return to the mainstream classes as his LRE as soon as possible, constituted a denial of FAPE under Section 504 and a violation of the ADA.

295. The District's failure to create an IEP that provided opportunities for mainstreaming during the 2017-18 SY likewise constituted a denial of FAPE under Section 504 and a violation of the ADA.

296. The District's failure to provide reasonable accommodations and to provide opportunities for mainstreaming, after being given notice of WV's desire to re-enter the mainstream--and when there are means to do so that were suggested by Parent-- constituted deliberate indifference to WV's rights under Section 504 and the ADA.

## Denial of Access to Dispute Resolution Procedures Under Section 504 or the ADA

297. The District refused to reimburse Parent for WV's placement in Westfield Day School, notwithstanding the CSE's ultimate acknowledgement that a small therapeutic school such as Karafin—which was selected during the August 2016 CSE because of its similarities to Westfield--was appropriate for WV. Therefore, Parent had to resort to litigation to recover tuition fees.

298. The Parent's burden was further compounded when the District violated WV' rights, and Parent's rights by association, under Section 504 by implementing a policy and practice of refusing to include Section 504 violations in the impartial hearing process, notwithstanding inclusion of such issues in the due process complaints and the assurance, under Section 504's procedural safeguards, of the right to an impartial hearing.

299. The District violated WV's rights, as well as Parent's rights by association, when the District failed to follow through on the grievance procedures, stated in its policies and Code of Conduct, notwithstanding the fact that it had been made aware, through its counsel and through Ms. Farruggio—the District's Section 504 co-ordinator-- of claims for violations under Section 504 in the due process complaints submitted to the Board of Education.

300. In failing to act after it was given notice of a basis for a complaint under Section 504 and the ADA, the District thus demonstrated its deliberate indifference to plaintiffs' rights to have their grievances be timely addressed under the statutes.

## WV's injuries that Resulted from the Defendants' Acts

301. In addition to the deprivation of his rights secured by the State and federal laws and statutes noted in this complaint, WV sustained injuries in the form of:
   a. WV's extreme emotional distress--while attending the middle school and, later, in Karafin, when he wished to return to the mainstream classes as soon as possible.
   b. Loss of access to options in the District's vast curriculum that was not available at Karafin – e.g. a series of electives in engineering and higher level language courses
   c. Emotional distress when Karafin attempted to make up for the deficits in its language program by trying to have WV catch up from an advanced Spanish 1 curriculum to a Spanish 3 level curriculum within only the first few months of the 2017-18 SY.
   d. Loss of academic standing in that WV's grades fail to accurately reflect his academic strengths.
   e. Delayed and more difficult remediation of WV's residual deficits in self-management that risk compromising his ability to effectively manage a postsecondary education and that negatively impacts future earning capacity
   f. WV's continued need for supplementary out-of-school counseling and coaching to compensate for the deficits in the IEP goals

## Parent's Injuries that Resulted from the Defendants' Acts

302. To compensate for the District's inadequate programs and deliberate indifference to its obligation to adequately meet WV's needs, Parent sustained non-pecuniary damages in that she had to bear the burden of seeking alternative or supplemental services for WV and the inconvenience of personally transporting WV to school when the District refused to provide transportation that accommodated WV's sleep apnea and when the Uber driver who initially agreed to drive WV could no longer do so.

303. To mitigate damages caused by the defendants failure to provide WV education and reasonable accommodations when he was at a vulnerable age, Parent had to prioritize WV's needs, thus sustaining damage to her own career and earning opportunities then and in the years to come.

304. Parent sustained her own independent injuries such as the deprivation of her rights secured under State and federal laws and statutes noted in this complaint, emotional distress, concerns over redistributing finances to private services and legal fees, family conflict, fatigue, loss of sleep, and other inconveniences inherent in having to pursue compensation through litigation—initially with representation by an attorney and then acting pro se.

**COUNT IV**
**Retaliation, Intimidation, and Interference with The Parent's Protected Acts of Advocacy**
**Under Title II of the Americans with Disabilities Act and §504 of the Rehabilitation Act of 1973**
(Parent on her own behalf and on behalf of WV  against the District)

305. Petitioners restate the preceding paragraphs as if set forth in full herein.

306. WV is a qualified individual with disabilities under the ADA and Section 504 of the RA by virtue of being a student in the District, by having conditions that limit him in major life activities, as stated herein, by having a record of such disabilities, and by receiving IEPs that provide him  special education and accommodations for limitations in major life activities arising from his disabilities.

307. To the extent that for Parent's children,  who are dually qualified to receive services under both the IDEA and Section 504,  the IEP may be utilized to implement services and provide required accommodations under Section 504, then advocacy undertaken for the creation  and implementation of their IEPs and other acts to further the provision of FAPE  may be considered protected acts under Section 504, and the ADA.

308. Throughout the period covering the events in this Petition from the 2007-08 to the 2018-19 school years,, Parent engaged in advocacy by requesting that the District  provide FAPE under both the IDEA and Section 504 of the RA to her children---WV as well as his siblings, Matthew Vinluan and DV.  Such activities are protected under the ADA and Section 504, in that she requested for reasonable accommodations and special education to enable WV and his brothers to equally participate in the district's programs and meet the challenging objectives and high standards that the District established for all its students.

309. Ms. Farruggio testified that, from the time she first came to the District to assume the position of Head of Special Education, in 2007, she became familiar with the case of WV's brother (MV).

310. As noted in the February 2019 evidentiary hearing for WV, in 2007, Parent had just resolved a conflict with the District, for which resolution she retained an attorney.  It can be inferred that Ms. Farruggio, as the incoming Director of Special Education, had knowledge of Parent's stringent advocacy for her children as early as 2007.

311. Ms. Farruggio testified in 2017, in a concurrent hearing for WV's brother, MV, that, in her position as Head of Special Education, she is asked to chair the more difficult cases, thus indicating that Parent has been marked by District personnel as a difficult case.

312. Inasmuch as the District's Board of Education's Policy Manual contains specific policies against retaliation on the basis of a disability, it can be inferred that the District is aware that acts of retaliation are prohibited.

313. The District was aware that Parent was engaging in protected activities during the years in question, especially in light of Ms. Farruggio also bearing the title of the District's Section 504 co-ordinator, whose responsibilities include the coordination of activities relating to compliance with Section 504.

314. The District was also aware that Parent's activities—e.g. requesting reasonable accommodations to enable her children equal benefits and participation in the District's programs -- are likewise protected acts under Title II of the ADA.

315. The District retaliated against WV or otherwise interfered with Parent's protected acts of advocacy for WV when it interfered with Parent's participation in the creation of WV's IEP and the provision to him of special education and accommodations, as stated below.

316. The District's acts of obstructing or interfering with Parent's advocacy for her children constitute a continuing violation, from 2007 until the present day, that created a hostile environment for WV and Parent, especially from 2013-14 through 2017-18 in that WV's educational program was adversely impacted as a result.

317. Individually and in concert, District personnel subjected Parent to adverse acts affecting both Parent and WV which include, but are not limited to:

 a. Misinformation and/or misdirections regarding WV's education plan, such as:
    - Ms. Farruggio denying Parent's request for a formal evaluation for Asperger Syndrome/Autism for WV in 2007 and not clearly informing Parent of the denial
    - District personnel misinforming Parent on several occasions that WV does not qualify for an IEP if he only receives related services—e.g. Ms. Fernandes in 2014 and the 2007 CSE that denied WV eligibility for an IEP and issued a Section 504 plan instead and Ms. Fernandes
    - Dr. Fischer failing to inform Parent of his denial of her request for a FBA
    - Dr. Fischer evidently fabricating a reason for not performing a FBA—i.e. that Parent did not provide written consent when none was requested, nor was one required at that time according to the SRO's analysis of the circumstances.

 b. Withholding PWNs when such PWNs are mandated under the IDEA—e.g. for denials of parent's requests

 c. School staff refusing to formally evaluate WV and provide a formal accommodation plan or IEP and instead resorting to DBT

   d.  Inaction--on the part of Ms. Winslow and Ms. Fernandes--that allowed WV to be subjected to punitive measures—e.g. detentions-- in dealing with manifestations of WV's disabilities rather than acknowledging the manifestations as such

   e.  Dr. Fischer implementing a behavior intervention which he knew to be inappropriate for WV and precipitating WV's episode of self-injury on March 21, 2016

   f.  Dr. Fischer refusing to provide Parent a note to take to the doctor

   g.  Ms. Farruggio instructing Dr. Fischer to not provide the note that Parent requested

   h.  Dr Fischer failing to conduct a proper FBA that informed school staff of WV's adverse response to a behavior intervention, notwithstanding his having witnessed firsthand the events that contributed to WV's emotional meltdown in March 2016

   i.  Ms. Farruggio creating a misleading record by misrepresenting the reason for not doing the FBA prior to the end of the 2015-16 SY—i.e. purportedly because WV did not return to the middle school—notwithstanding that Dr. Fischer's observation should have provided enough data for an initial FBA and BIP

   j.  Ms. Farruggio intercepting Parent's requests to Ms. May and Dr. Fischer for assistance in WV's application to a private school and effectually blacklisting Parent and WV such that that no teacher will assist them in their application to private school.

   k.  Ms. Farruggio spearheading the CSE's decision to deliberately place WV in an inappropriate program in his April 2016 IEP —i.e. the home school's ESP – without significant change in his IEP

   l.  Ms. Farruggio inexplicably and irrationally refusing to provide transportation to Karafin School as a related service in light of his evident need for accessible transportation that accommodates his sleep apnea

   m.  Ms. Farruggio irrationality refusing to include a specific transition plan for WV to return to the mainstream as the LRE once the issues behind his undesirable behaviors were identified and he showed improvement with appropriate interventions in Karafin

   n.  Ardsley High School staff—e.g. school psychologist Monica Ricci-- purportedly performing a FBA but doing so superficially and refusing to specifically address the active or potentially serious behavior issues that Parent specifically requested when she again gave consent for a FBA upon WV's return to the District's school.

318.  In light of the fact that the acts of the District's personnel occurred in response to Parents' requests for special instruction and accommodations for WV, a causal connection between the

protected activities—i.e. Parent's stringent advocacy-- and the adverse actions can be inferred, as set forth below.

319. Knowledge of and compliance with procedures and regulations pertaining to the IDEA, Section 504 of the RA, and NY State laws related to the said statutes are inherent in the responsibilities of Ms. Farruggio and school staff who are CSE members or who are tasked with implementing WV's IEP or with performing evaluations or monitoring his progress to comply with such legislation.

320. Departure from such established procedures run contrary to the Acts' provisions regarding the provision of FAPE to all students eligible for services under the said acts, and, therefore, constitute disparate and retaliatory treatment of WV and Parent compared to other students and parents similarly situated.

321. The defendants improperly departed from established procedures for the creation of the educational program for WV and and actively refused to comply even after being directed towards compliance by Parent's reasonable requests or being otherwise mandated to do so by State regulations and the District's own policies. Examples of such refusals include, but are not limited to the following examples:

   a. CSE members resisted Parent's reasonable requests such as writing IEP goals that are objective, observable, and measurable

   b. Staff tasked with implementing DBT, which Ms. Farruggio purports to be an RTI measure, did not perform progress monitoring or maintain records of WV's progress to reflect his actual response to interventions, in accordance with State and the District's own policy with respect to RTI. Thus, they deprived future CSEs and Parent of information needed to determine WV's needs and obstructed advocacy for the services WV needed.

   c. School staff failed to conduct a FBA and create a BIP notwithstanding the requirement under State law and the IDEA that such an evaluation be performed for students whose behaviors interfere with learning, the escalating evident need for such measures in WV's case when self-injurious acts occurred in school notwithstanding the provision of services, and Parent's explicit request for such an evaluation.

   d. School personnel repeatedly failed to provide Parent a PWN that stated, with clarity and finality, the District's intended course of action—e.g. when Ms. Farruggio effectually denied Parent's request for a formal evaluation for Asperger syndrome for WV in 2007 or when Dr. Fischer effectually denied her request for a FBA in September 2015 and again in March 2016.

   e. School personnel denied or otherwise avoided convening CSE meetings requested by Parent, thus depriving Parent of a forum for advocacy where she has a right to equal

participation and to decisions that are based on WV's needs. Instead, Ms. Farruggio and other school staff made decisions outside the CSE—e.g. WV's placement in IDT.

322. By withholding from the Parent mandated notices that would have informed Parent of its intended course of action, the District effactually prevented or delayed Parent from further advocating and objecting to such intended actions—e.g. by requesting an Independent Educational Evaluation or an impartial hearing.

323. Based upon information from Dr. Fischer himself, Dr. Fischer, upon instruction from Ms. Farruggio, refused to provide Parent a written record of what transpired to precipitate WV's self-injury on March 21, 2016, notwithstanding his initial agreement to do so when Parent requested such a note from him to take to the doctor, which visit Dr. Fisher had recommended be done.

324. The District's refused to perform a FBA for WV, notwithstanding the fact that it had already agreed to the FBA, that Parent had already provided a written consent for one, and Dr. Fischer had already witnessed an episode of WV's self-injury that required such an evaluation and a BIP to prevent recurrence.

325. Dr. Fischer reported having worked with autistic children taught through ABA, and he specifically inquired about the events antecedent to WV's expressed thoughts of self-injury that precipitated WV's hospital admission in May 2015. Thus Dr. Fischer indicated his recognition of the need to scrutinize such antecedent circumstances when attempting to determine the reasons for undesirable behavior.

326. However, when tasked with performing WV's FBA in March 2016, he failed to give the matter the same due scrutiny and analysis that a FBA requires.

327. Instead of providing a detailed account of the events—as he showed he was able to do during the due process hearing—Dr. Fischer's written report consisted only of conclusory statements that can lead to the erroneous conclusion that WV's behaviors arose spontaneously and randomly.

328. From such circumstances—that Dr. Fischer was aware of the proper approach and the kind of information needed to create valid and reasonable hypotheses for the reasons behind WV's behavior, yet he refused to divulge such details—it is evident that obstructing Parent's advocacy in March 2016 was a motivating factor in the District's failure to perform the FBA.

329. But for Ms. Farruggio's interference and intent to chill Parent's advocacy, Dr. Fischer would have provided a properly detailed report of the incident, such that hypotheses can be generated regarding precipitating factors for WV's behavior and plans for appropriate interventions formulated to minimize their recurrence.

330. Dr. Fischer refused to communicate with WV's private counselor's by providing a note, as Parent had requested, and instead insisted only on a phone conversation, thus making it more difficult to keep a record of the rationale for decisions made in the course of WV's management.

331. Such refusal evinces Dr. Fischer's obstructive and discriminatory intent in light of the fact that Dr. Fischer can and did make a written referral to IDT, thus indicating that, but for his and Ms. Farruggio's goal of obstructing Parent's advocacy, Dr. Fischer does comply with the reasonable expectation of a written correspondence between professionals who share management of a patient.

332. Whereas Dr. Fischer asked to speak with WV's private counselors regarding the March 21, 2016 event, he failed to respond when Parent requested that he, as well as Ms. May, assist WV in his application to other schools by speaking to admissions personnel.

333. Instead of a response from Dr. Fischer and Ms. May, Parent received an email from Ms. Farruggio on behalf of the entire school, notwithstanding the fact that Ms. Farruggio was not consulted by Parent regarding WV's application to non-District schools.

334. Whereas Dr. Fischer had previously insisted only on verbal exchanges and refused to create a written correspondence to WV's private counselors, Ms. Farruggio then instituted a blanket policy that prohibited any school staff from speaking to admissions personnel from other school programs regarding WV, and instead only allowed WV's records to be released to the prospective schools, notwithstanding the absence from WV's records of relevant details regarding the circumstances that precipitated WV's challenging and potentially dangerous behavior on March 21, 2016.

335. The inconsistent and arbitrary practices exhibited by Dr. Fischer and Ms. Farruggio under those circumstances indicate that their overall goal was not the proper creation of WV's educational program but the obstruction of Parent's advocacy efforts to gather accurate information on which to base a determination of WV's needs that arise from his disabilities and to obtain for WV an appropriate placement that would meet those needs.

336. The evident resistance exhibited by Ms. Farruggio and other school staff in creating and maintaining a record that accurately reflects WV's true level of functioning and needs constitutes conscious avoidance in knowing the truth—i.e. District personnel consciously and willfully took actions to avoid knowing the truth regarding WV's disability-based needs in order to obstruct Parent's advocacy for WV and to deny him the evaluations and services he needed to meet those needs.

337. By implementing an intervention he knew to be inappropriate for WV, in light of his knowledge from the June 2015 CSE meeting that WV, under stress, has in the past resorted to talk and acts of self-injury that required hospitalization, Dr. Fischer created for WV foreseeably

intolerable conditions akin to effectuating a constructive discharge in response to Parent's refusal to enroll WV in IDT.

338. When the IHO's questioned Dr. Fischer regarding his actions during WV's March 21, 2016 meltdown, Dr. Fischer responded that he so acted because WV's transfer to IDT did not work out. Thus Dr. Fischer indicated that Parent's advocacy for WV –i.e. her decision to not immediately transfer WV to IDT, as Dr. Fischer and the heads of the Special Education department had planned, and to, instead, request a CSE meeting--was a motivating factor for Dr. Fischer's improper behavioral intervention.

339. As Parent stated in her amended due process complaint, the District's adverse acts against Parent in response to her stringent advocacy for her other son, MV, also played a part in motivating the District to curtail Parent's advocacy in this matter and was sufficient to overwhelm her and consequently chill her advocacy for her other children, including WV.

340. The District obstructed dispute resolution procedures for violations of Section 504, as set forth below and in Count III.

341. In the matter of due process hearings for Parent's three children, the District enforced a retaliatory practice of refusing to adjudicate Section 504 violations during the impartial hearing process, in violation of that Act's procedural safeguards, while, simultaneously refusing to settle IDEA claims unless Parent waives all rights, including claims pertaining to Section 504/ADA violations. Thus the District obstructed Parent's advocacy efforts.

342. At the same time, the District repeatedly failed to employ its administrative procedures to act on claims stated in the due process complaints addressed to the Board of Education and of which Ms. Farruggio, as section 504 co-ordinator, was aware.

343. The joint implementation of such practices in response to Parent's attempts to seek relief for the District's violations under Section 504 effectually obstructed acts of advocacy under Section 504 or the ADA , and that the District did so instituted and perpetuated such policies evinced its reckless disregard or deliberate indifference to the rights of Parent and her children to be free from discrimination and the injuries that would result and their rights to seek timely relief for such violations.

344. As a result of the defendants' actions, Plaintiffs sustained injuries as mentioned above.

## COUNT V
## Deprivation of Plaintiffs' Rights to Equal Protection of the Laws under the 14th Amendment by District Personnel Acting Under the Color of Law
## 42 U.S.C. §1983
(Parent on her own behalf and on behalf of WV against the District and,
in their individual capacities, Jeanne Farruggio and Thomas Fischer)

345. Plaintiff reiterates the preceding paragraphs as if stated in full herein.

346. Jeanne Farruggio, the District's Asst. Superintendent for Pupil Personnel Services and Special Education, has been the Head of Special Education services since 2007.

347. In her official capacity, Ms. Farruggio is responsible "for establishing administrative practices and procedures for training all District personnel responsible for carrying out the provisions of Part 200 of the Commissioner's Regulations as well as members of the Committee on Special Education."

348. Ms. Farruggio has also authored a number of issues of the *District Policies and Procedures for Assuring Appropriate Educational Services and Due Process in Evaluation and Placement of Students With Disabilities.*

349. During the relevant school years, Ms. Farruggio also acted as the District's Section 504 coordinator.

350. Ms. Farruggio may be recognized as an individual whose edicts or acts may fairly be said to represent official policies pertaining to special education and discrimination against students on the basis of disabilities.

351. Dr. Thomas Fischer is the school psychologist tasked with implementing WV's goals in the IEP and with performing a FBA for WV.

352. Ms. Farruggio and Dr. Fischer, while acting under the color of law and in their official and individual capacities, entered into an agreement to take adverse actions against the plaintiffs Parent and WV, as set forth above under Count IV, because Parent opposed the District's discrimination against her children and opposed its failure to provide them FAPE.

353. By retaliating against Parent and WV for their advocacy, Ms. Farruggio and Dr. Fischer deprived Plaintiffs of the equal protection of the laws and did so with the goal of obstructing further advocacy and to further their own personal interests instead of the District's as set forth below under Count VI.

354. Ms. Farruggio and Thomas Fischer acted individually and in concert to effectuate adverse acts stated herein and under Counts III and IV against Parent and WV, such as:

   a. Withholding PWNs

   b. refusing to convene CSE meetings to address clearly evident behavior issues that needed to be addressed

    c.  refusing to properly conduct a FBA and implement a BIP notwithstanding observations have already been made

    d.  Ms. Farruggio interfering with Parent's request for assistance with applications to private schools

    e.  Irrationally recommending, during the April 2016 CSE meeting, for WV to return to the District's ESP without evaluating WV *prior* to that placement or making appropriate IEP changes to address WV's self-injurious behavior while he was in the ESP.

    f.  Indicating the District's home school's ESP as WV's placement in the April 2016 IEP, notwithstanding their own attempt to place WV in IDT, in acknowledgement that WV needed more intensive services than the ESP can provide.

    g.  Steering the CSE towards a placement they <u>knew to be inappropriate for WV</u> in order to justify refusing to consider Parent's reasonable request to fund WV's interim placement in Westfield when IDT and other State approved schools were not immediately available for the last quarter of the 2015-16 school year.

355. The District's attorney, Carol Melnick, in her official capacity, retaliated or otherwise interfered with Parent's advocacy for WV by attempting to intimidate Parent --by refusing settlement of the administrative claims and thereby increasing the cost of litigation unless Parent agreed to waive WV's right to pursue non-IDEA based claims as well.

356. Defendants Ms. Farruggio and Dr. Fischer imposed injuries on the plaintiffs or caused said plaintiffs to be injured by selectively failing to enforce lawful procedures it was obligated to uphold, such as those under the IDEA and Section 504 of the RA, as well as by failing to comport with the District's own policies applicable to all students and their parents, including antiretaliation policies, and those pertaining to non-discrimination in accelerated programs.

357. Ms. Farruggio and Dr. Fischer deprived Plaintiffs of the latter's rights to have WV equally access and equally benefit from the District's self-declared mission of maximizing every student's potential.

358. In taking retaliatory actions against Parent and WV for their advocacy against discrimination, the District, Ms. Farruggio, and Dr. Fischer impermissibly treated plaintiffs differently from other individuals similarly situated.

359. A causal connection between Parents' protected activities and the defendants' adverse acts upon WV can be inferred, as discussed in Counts III and IV above.

360. The defendants performed such adverse acts in violation of the clearly established laws of the Equal Protection clause of the 14th Amendment, Section 504 of the Rehabilitation Act, Title II

of the ADA, and the IDEA—laws which defendants knew or should have known in light of their positions and responsibilities.

361. In knowing their acts to be improper but nevertheless engaging in such violations, the defendants acted with deliberate indifference or reckless disregard for Parent's and WV's rights under those above mentioned clearly established laws.

362. There is no rational basis for the defendants' actions.

363. There is also no legitimate State interest that could have been served by the differential treatment the defendants imposed on the plaintiffs and the other courses of action taken by the defendants, in violation of Plaintiffs' clearly established rights under the stated laws and regulations, which the State has also agreed to uphold upon its receipt of federal funds.

## COUNT VI
### Conspiracy by District Personnel to Deprive Plaintiffs of their Rights to Equal Protection of the Laws Under the 14th Amendment
### 42 U.S.C. §1985
(Parent on her own behalf and on behalf of WV, against the District and, in their individual capacities, Jeanne Farruggio and Thomas Fischer)

364. Plaintiff reiterates the preceding paragraphs as if stated in full herein.

365. Ms. Farruggio and Dr. Fischer conspired to take adverse action against Parent and WV, thereby depriving the said Plaintiffs of the equal protection of the laws, because Parent opposed the District's discrimination against her children based on their disabilities and opposed its failure to provide her children FAPE.

366. Such conspiratorial acts agreed upon and actually committed by Ms. Farruggio and Dr. Fischer include, but are not limited to:

   a. Attempting to change WV's placement by transferring WV to IDT without the benefit of a CSE meeting to first determine WV's needs and the means by which those needs can be met;

   b. Refusing to document Dr. Fischer's observations of WV and the circumstances surrounding WV's episode of self-injury on March 21, 2016.

   c. Refusing to perform the FBA, to which Parent had already consented, and to have such a report ready for WV's April 20, 2016 CSE meeting, as would have been expected for a CSE meeting convened expressly for the purpose of determining appropriate behavioral interventions going forward.

    d.  Refusing to allow any of the District school's staff to speak with the admissions departments of any school to which WV was applying, and instead only allowing the release of WV's records, from which the circumstances pertaining to WV's self-injurious behaviors had been withheld by Dr. Fischer.

    e.  Steering the CSE towards placing WV back in the District's home school--notwithstanding their prior recommendation for WV to have been enrolled out-of-district in IDT had a vacancy been available—in order to obstruct Parent's efforts to have WV placed in Westfield, absent any other option.

    f.  Deferring a FBA until Parent return WV to the district school, thus avoiding the obligation to document the March 21, 2016 episode

367.  In agreeing to depart from the procedures and safeguards for creating an IEP or an Accommodation plan as dictated by the IDEA, Section 504, and NY State laws, Ms. Farruggio and Dr. Fischer conspired to subject plaintiffs to differential treatment compared to other students with disabilities and their parents, who are similarly situated in that they rely on compliance with the laws in question for the creation of an appropriate program for a disabled student.

368.  To the extent that the State secures to its disabled citizens the equal protection of the laws by establishing the said safeguards and procedures, and that the creation of education programs rely on accurate evaluations and observations of the disabled student's functioning, Ms. Farruggio and Dr. Fischer engaged in a conspiracy to hinder the State from securing to its citizens the equal protection of the laws when they conspired to purposely mislead and to create inaccurate records of WV's responses to the school's interventions by withholding information about WV's March 21, 2016 emotional breakdown from those records.

369.  Ms. Farruggio and Dr. Fischer conspired to commit those adverse acts with the invidious discriminatory animus against WV and Parent as members of a class of individuals who stringently advocate for or request from the District that it provide reasonable accommodations and services for mentally disabled students, such as WV in this matter.

370.  Ms. Farruggio and Dr. Fischer conspired to retaliate—as described above-- against Parent and WV, and did so, not for the purpose of accomplishing the school's legitimate objectives to provide FAPE, but to further their own personal interests.

371.  Ms. Farruggio and Dr. Fischer acted to withhold information from school records, to obstruct Parent's advocacy, and to avoid recriminations for their own gross misjudgments in not acknowledging WV's underlying autism and other disabilities, and they did so in reckless disregard for WV's safety and for plaintiffs' rights to FAPE and equal protection.

372.  Ms. Farruggio's consistent failure, as the CSE chairperson, to lead the CSE in the creation of an IEP based on WV's then current needs and level of functioning-- as is the District's duty to provide--indicates that her goal is not to accomplish the District's duty but to serve her own purpose.

373. Ms. Farruggio's invidiously discriminatory animus is evident in her history of irrational decisions that reflect a pattern of antagonism towards Parent's advocacy. Clearly. Ms. Farruggio is guided, not by the procedural safeguards of the IDEA or Section 504, but by the intent to obstruct Parent's advocacy, to the extent that Ms. Farruggio ends up contradicting herself, as set forth in the examples below.

   a. In light of Ms. Farruggio's admission that, to evaluate a student for Asperger Syndrome/autism, the District relied/s on referrals to outside evaluators-- such as a medical doctor or someone with that level of expertise-- Ms. Farruggio made an irrational clinical judgment in 2007 in determining that WV did not have autism and, therefore, no such referral was needed. Ms. Farruggio failed to recognize that she herself did not possess the expertise to make the diagnosis, and, therefore, neither did she have the expertise to refute the diagnosis.

   b. After recommending that WV enroll in IDT in March 2016—thus acknowledging that WV needed intervention more intensive than that which the District's ESP can provide--Ms. Farruggio expressed to the April 2016 CSE her conviction that WV should return to the ESP. Thus Ms. Farruggio encouraged the CSE into placing WV in a setting she knew to be inadequate for his needs, and, therefore, inappropriate.

   c. While, during the April 2016 CSE meeting, Ms. Farruggio insisted that the District's ESP was the appropriate placement for WV, she nevertheless offered to send out referrals to out-of-district non-public schools—which offer made no sense if she truly believed that the ESP was appropriate for WV.

   d. Ms. Farruggio cancelled the completion of the FBA to which Parent consented in 2016, notwithstanding the clear need for one at the time. Her decision to defer the evaluation defied reason in light of the fact that Dr. Fischer and Mr. Steinberg had already observed an incident of self-injury that required such an evaluation, and the only step remaining in the process was to write the report. Clearly the intent of Ms. Farruggio and Dr. Fischer was to prevent reports of the incident from coming to light, in reckless disregard of WV's rights.

   e. Notwithstanding the August 2016 CSE's concern over WV's need for a late start and Parent's email to Ms. Farruggio that such a need for a late start and travel time are major factors in the choice of WV's school, Ms. Farruggio refused to make that reasonable accommodation and instead risked subjecting WV to continued stressful conflicts with Parent in the morning and to potential absences from school due to missing the bus.

374. Ms. Farruggio thus subjected Parent and WV to arbitrary and capricious decisions that imposed her own personal preferences and convictions without giving rational justification, based on WV's then current level of functioning or needs, for such preferences.

375. Thus Ms. Farruggio revealed that she served not to further the District's goal of creating an appropriate program for WV but to bully Parent and punish her for her advocacy by opposing Parent's reasonable requests for accommodations and services for WV.

376. As a result of Dr. Fischer's and Ms. Farruggio's conspiracy, Parent and WV were deprived of their rights to the equal protection of the laws, their right to FAPE under the IDEA and Section 504, and also suffered the injuries previously stated above.

### COUNT VII
### Deprivation of Plaintiffs' Rights Under the 4th and 8th Amendments and the Substantive Due Process Clause of the 14th Amendment by District Personnel Acting Under the Color of Law
### 42 U.S.C. §1983
(Parent on her own behalf and on behalf of WV against District and, individually, Jeanne Farruggio and Thomas Fischer)

377. Plaintiff reiterates the preceding paragraphs as if stated in full herein.

378. A student's rights under the Fourth, Eighth, and Fourteenth Amendments are clearly established rights, of which the defendants knew or should have known.

379. Dr. Fischer deprived WV of his rights, under the Fourth Amendment, to be free from seizure when he physically compelled WV to walk from the first floor health office to his third floor Math class while WV was evidently resisting him.

380. Dr. Fischer denied WV of his Eighth Amendment rights when, after failing to provide WV accommodations for his sleep dysregulation, Dr. Fischer forced WV to return to class at a time when he showed evidence of distress and sleep deprivation and sought to go to the health office.

381. Dr. Fischer and Ms. Farruggio, in their official and individual capacities, deprived WV of his substantive due process rights--as provided by New York State to its students under 8 NYCRR §§19.5 and 200.22--to be free from aversive interventions--including physical restraint-- and from corporal punishment, and from the use of physical force unless in an emergency situations that requires the use of reasonable force.

382. The defendants deprived WV of his substantive due process right to a FBA/BIP, as provided by the IDEA and its related New York State Laws.

383. The above deprivation of rights is a direct result of the District's evident policy and practice of failing to perform a FBA and create a BIP—or, in the alternative, its failure to train its personnel in the recognition of the need for a FBA/BIP and in how to perform a FBA and create a BIP.

384. It is clearly foreseeable, to a moral certainty, that school personnel will confront a given situation which will present the personnel with a difficult choice-- whether or not to perform a FBA-- and that training or supervision regarding FBAs will make the choice less difficult.

385. Because FBAs serve to guide behavior intervention plans and prevent aversive behavioral interventions or the unreasonable use of physical force, it is clear, to a moral certainty, that the employee's wrong choice will frequently result in the violation of the student's constitutional rights to be free from such interventions.

386. Therefore, the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of a constitutional right, that, in failing to train its staff, the District can reasonably be said to have been deliberately indifferent to the needs of WV.

## Constructive Discharge

387. The defendants deprived WV of his right to continue attendance at his home school without fear of undue danger or punishment.

388. It was foreseeable, given WV's past talk and escalating acts of self-injury when distressed that being humiliated and physically compelled to go to class would result in acts of self-injury, as a manifestation of his disabilities.

389. Notwithstanding evidence that the District's behavioral interventions were aversive to WV and Parent's request for a change in such interventions, Dr. Fischer refused to take the necessary steps to perform a FBA and formulate a new behavior intervention plan specific to WV's needs, thus effectuating a constructive discharge for WV.

390. Rather than perform a FBA and create an appropriate BIP, the defendants recommended placement in IDT--a "30-plus" days program—without a formal psychiatric evaluation to ensure an accurate diagnosis or a CSE meeting to ensure placement was appropriate for WV's needs.

391. Without giving due consideration for WV's underlying autism, Dr. Fischer evidently supported pharmacologic intervention and strongly suggested, as options for WV, placements that provided such intervention--hospitalization or intensive outpatient management, or IDT.

392. Notwithstanding his evident preference for pharmacologic intervention and the availability of a psychiatric consultation, Dr. Fischer's failed to recommend that the District obtain a formal psychiatric consultation for WV prior to recommending a change in WV's placement.

393. After Parent initially refused placement in IDT and instead requested a CSE meeting, Dr. Fischer implemented intervention which he knew was inappropriate and which foreseeably precipitated another incident that required WV to go to the hospital.

394. Dr. Fischer then refused to write a note, to be given to WV's doctors, describing in detail the specific antecedent events that led to WV's emotional breakdown.

395. It bears noting that the existence of specific precipitating factors which were **avoidable** impacted the clinical decision regarding whether or not psychiatric admission was necessary to avoid harm to WV.

## State Created Danger

396. In retaliating against Parent for her advocacy, the defendants subjected WV to State created danger.

397. WV is of the age of compulsory school attendance and the District has only one school serving his grade.

398. The District and its schools' staff have custodial and tutelary responsibilities toward WV as a student.

399. In accepting federal funding, the District also accepted a duty to educate WV in accordance with the provisions of FAPE under the IDEA and Section 504.

400. WV is, therefore, a member of a discrete class of persons subjected to the potential harm brought about by the actions or inaction of the District schools' staff and, in particular the Special Education department..

401. As a student placed in the District's ESP, WV was a foreseeable victim of the actions or inaction of Dr. Fischer, who was the school psychologist in charge of WV for that program in the middle school.

402. In accordance with the provisions of FAPE under the IDEA and consistent with Parent's fundamental right to guide the care and education of her child, the District and individual defendants were mandated to share information with Parent and provide notice of its intended courses of actions that impact the provision of FAPE to WV.

403. Notwithstanding such clearly established laws, Dr. Fischer failed to inform Parent that her request for a FBA was denied, much less provide a PWN as mandated under the IDEA for denials of requests pertaining to the provision of FAPE to WV.

404. When Parent requested a report from the FBA, Dr. Fischer evidently fabricated a reason-- that no FBA was performed because Parent failed to provide a consent, even though no such consent was required at that time.

405. Dr. Fischer's failure to inform Parent of the denial of her request for a FBA/BIP rendered WV more vulnerable than if Dr. Fischer had overtly denied her request, in that Parent was given a false sense of security that WV was under appropriately close observation and management when, in fact, he was not.

406. Dr. Fischer's assurance to Parent, during the June 2015 CSE meeting, that the school staff will *not* resort to using physical force in managing WV's behavior rendered WV more vulnerable than if Dr. Fischer had not so informed her, in that Parent was, again given a false sense of security that no such act would occur.

407. The District's assurance to Parent that they will perform a FBA/BIP—combined with a pre-existing history of WV's history of past hospitalization and suicide risk assessments—rendered WV more vulnerable than if the school staff had refused a FBA/BIP because the assurance gave Parent a false sense of security that school staff will review WV's history and avoid foreseeable risks.

408. Had the District divulged sooner the evident inexperience or unwillingness of its staff with regards to performing FBA/BIPs, Parent would have requested sooner either an independent evaluation or an out-of-district placement.

409. The District's recommendation for WV's placement in IDT without a FBA and a CSE meeting likewise rendered WV vulnerable to danger from pharmacological management in the absence of an accurate diagnosis that would warrant such pharmacologic management.

410. Even when the defendants had an opportunity to perform a FBA and create a proper BIP in preparation for the April 2015 CSE meeting, the defendants refused to do so and irrationally postponed the evaluation, notwithstanding Dr. Fischer already performed the observation.

411. The defendant's willful refusal to create a record that would provide other school staff information regarding situations that can result in distress and injury for WV—and thus potentially reduce the risk of its recurrence, in light of evidence of escalating behaviors--shocks the conscience.

412. The April 2016 CSE's creation of an IEP which placed WV back in the program wherein he exhibited an escalating pattern of self-injurious behavior—without a prior evaluation to determine if he is "stable" or IEP changes to prevent recurrence—shocks the conscience.

413. Although Parent had removed WV from the school at the time that the April 2016 IEP was formulated, she did so at great financial cost that was not sustainable for the long term, and both WV and Parent remained subjected to injuries arising from the District's decisions regarding WV's placement.

414. Thus Dr. Fischer and Ms. Farruggio's actions left Parent with no recourse but to have WV remain in a private school at a high cost, thus compounding Parent's emotional distress and depriving WV of FAPE in its refusal to fund the private placement.

## COUNT VII
### Punitive Damages
(Parent on her own behalf and on behalf of WV against Jeanne Farruggio and Thomas Fischer)

415. Plaintiff reiterates the preceding paragraphs as if stated in full herein.

416. Defendants Thomas Fischer and Jeanne Farruggio demonstrated reckless disregard for the rights of WV and Parent in managing WV's education program and for WV's safety while under the District's custody in school.

417. Dr. Fischer rendered WV vulnerable to the dangers of mismanagement when he ignored Parent's request to convene a CSE meeting to discuss a change in placement for WV.

418. Dr. Fischer and Ms. Farruggio abused their position and authority when they circumvented established procedural safeguards under the IDEA applicable to the change in placement of a disabled student.

419. Rather than convene the CSE meeting which Parent requested, Dr. Fischer and Ms. Farruggio attempted to transfer WV to IDT without first seeking a psychiatric consultation, without first performing a FBA, without mentioning WV's diagnosis of autism in the IDT referral, and without the input of CSE members to determine if such a placement was indeed appropriate for WV.

420. To the extent that Dr. Fischer evidently favored pharmacological management he exhibited reckless disregard for WV's rights to a placement determined by a CSE and based on a comprehensive evaluation of WV's current needs when he failed to recommend a formal psychiatric consultation to confirm the appropriateness of his recommendations prior to recommending a transfer to IDT.

421. Dr. Fischer knew to be inappropriate the intervention he implemented with WV on March 21, 2016—i.e. using physical force—but he nevertheless proceeded to employ it.

422. There was no "emergency" situation that warranted the use of reasonable physical force on WV, under New York State Law.

423. Where there was no emergency or immediate danger, and the use of physical force could have been avoided by allowing WV to go to the health office, such application of force was unreasonable.

424. Dr. Fischer's own description of the event—that WV was shaking off Dr. Fischer's hands or otherwise acting to withdraw from physical contact—should have alerted Dr. Fischer to WV's aversion to the method of intervention he was applying, but Dr. Fischer persisted anyways.

425. Furthermore, in light of prior incidents wherein WV demonstrated escalating self-injurious behavior when subjected to pressure to return to class, it was foreseeable that WV will resort to self-injury, yet Dr. Fischer continued with his improper course of action anyways.

426. Dr. Fischer then refused to help Parent obtain proper management for WV by providing a note that conveyed to WV's other service providers the specific circumstances that precipitated WV's reaction and which would have been relevant to his future management.

427.  After the March 21, 2019 incident, Dr. Fischer refused to take measures to mitigate damage to WV by actually performing the FBA/BIP in accordance with his own evident knowledge of the relevance of the events antecedent to a behavior in creating an appropriate intervention.

428.  During the April 20, 2016 CSE meeting, Dr. Fischer again failed to share with the CSE the relevant details of the event which led to WV's emotional breakdown in March 2016.

429.  Upon information provided by Dr. Fischer, Jeanne Farruggio relied on her authority to specifically instruct him to refrain from providing a note for Parent to bring to the doctor regarding the March 21, 2016 event, notwithstanding Dr. Fischer's initial agreement to provide Parent such a note.

430.  Ms. Farruggio, abused her position and authority by steering the opinions of the other members of the April 2016 CSE to formulate an IEP which irrationally placed WV back in the home school's ESP—the same setting wherein his escalating behaviors occurred and where he was goaded to the point of self-injury in the absence of appropriate behavioral interventions.

431.  Ms. Farruggio made such a recommendation to place WV back in the ESP without any significant evaluation or change in WV's IEP or a discussion of a new BIP geared towards prevention of self-injury.

432.  Inasmuch as Ms. Farruggio and Dr. Fischer both acknowledged that WV should not be in the middle school's ESP but, instead, should be in IDT, had there been a vacancy in that program, both knew that the services that ESP could reasonably provide was inadequate for WV's needs at the time, but they chose to recklessly disregard that information and WV's rights to an appropriate placement by placing him in ESP anyways.

433.  When a student has an adverse reaction to an intervention, it is imperative that other individuals charged with that student's management are made aware of the potential for the adverse reaction, so that recurrence may be prevented, especially if a student has little choice but to return to school, as is the case of a student, such as WV, who is still within the age of compulsory attendance.

434.  Although Ms. Farruggio agreed to refer WV to other schools, she failed to mitigate the risks to WV by refusing to proceed with the FBA and BIP to which Parent and the District had already agreed, notwithstanding the fact that Dr. Fischer already made significant observations which can be utilized for the creation of an appropriate BIP.

435.  The observations of Dr. Fischer and Mr. Steinberg should have been included in the referrals to other schools, to give the receiving schools an accurate and adequate notice of foreseeable risks to WV, so that the said schools can make an informed decision regarding its ability to manage WV's needs.

436. Rather than make use of the observational data already gathered, Ms. Farruggio and Dr. Fischer recklessly disregarded mandates for the performance of a FBA and other established procedures designed to determine an appropriate educational placement for WV.

437. Instead, Ms. Farruggio and Dr. Fischer conspired to retaliate against plaintiffs and obstruct Parent's advocacy by refusing to divulge in WV's records his adverse reaction to the behavior interventions Dr. Fischer and Mr. Steinberg utilized.

438. Ms. Farruggio and Dr. Fischer so conspired to protect their own personal interests by withholding from school records evidence of their own gross misjudgment in failing to recognize or acknowledge WV's underlying diagnoses--autism in particular.

439. That Ms. Farruggio and Dr. Fischer so conspired to withhold such information from the school records—even after having been made aware of the potential for bodily injury when WV is subjected to certain interventions—shocks the conscience.

440. In their conspiracy and acts to further that conspiracy, Ms. Farruggio and Dr. Fischer demonstrated their reckless disregard for WV's future safety in school, for his rights to be free from aversive interventions and state created danger, and for WV's and Parent's rights to have access to his education in the mainstream setting with reasonable accommodations such as an appropriately formulated BIP.

441. The defendants' actions exhibit elements of fraud, gross negligence, abuse of their authority, a dereliction of their duty as public servants to uphold the public's trust, and a reckless disregard of plaintiffs' rights and reasonable expectation of WV's safety in school under the care of the District personnel..

442. Inasmuch as it is in the public interest that public servants such as public school staff should be deterred from committing similar abuses of authority in reckless disregard of the safety and rights of the public that they serve, punitive or exemplary damages against Ms. Farruggio and Dr. Fischer are warranted.