UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 3/18/2021

---

MARIA THERESA C. VINLUAN,
*on her own behalf and on behalf of her minor child,*
WV

                    Plaintiff,

        -against-

ARDSLEY UNION FREE SCHOOL DISTRICT,
JEANNE FARRUGGIO, & THOMAS FISCHER,

                    Defendants.

19-cv-10674 (NSR)
OPINION & ORDER

---

NELSON S. ROMÁN, United States District Judge

        Plaintiff Maria Theresa C. Vinluan ("Plaintiff") commenced this action on or about

November 18, 2019, on her own behalf and on behalf of her minor child, WV, against Ardsley

Union Free School District ("Ardsley"), Jeanne Farruggio ("Farruggio"), in her individual

capacity, and Thomas Fischer ("Fischer"), in his individual capacity (collectively, "Defendants")

alleging violations of the Individuals with Disabilities Education Act ("IDEA"), Section 504 of

the Rehabilitation Act of 1973 ("Section 504"), Title II of the Americans with Disabilities Act

("ADA"), and Sections 1983 and 1985 of the Civil Rights Act ("Section 1983" and "Section

1985").

        On June 22, 2020, Defendants filed a motion to dismiss the Complaint. (ECF No. 28.)

For the following reasons, Defendants' motion is GRANTED in part and DENIED in part**.**

## BACKGROUND

        The following facts are taken from Plaintiff's Complaint, dated November 18, 2019 (ECF

No. 1.)

Plaintiff's son, WV is a 17-year old student attending Ardsley's high school. (ECF No. 1 ¶ 1.)

## I.      Preschool

As a preschool student, WV showed difficulties with communication and rigidity that manifested as failure to comply with instructions. (*Id*. ¶ 5.) A pediatric neurologist diagnosed WV with Asperger syndrome, a condition among the Autism Spectrum Disorders. (*Id*. ¶ 6.) As such, WV was classified as a preschool child with a disability under the IDEA and received Early Intervention programs. (*Id*. ¶ 4, 7.) For the school years 2005-2006 and 2006-2007, Ardsley's Committee on PreSchool Special Education (the "CPSE") provided WV with intensive full-day services, including an extended school year and parent training, through the Fred S. Keller School. (*Id*. ¶ 9.) WV greatly improved under the Applied Behavior Analysis ("ABA") methods utilized by the Fred S. Keller School and his problem behaviors became less prominent. (*Id*. ¶ 12.)

## II.     Elementary School

In 2007, upon WV's transition from preschool to elementary school and the termination of services provided by the CSPE, Plaintiff referred WV for an evaluation by the Committee on Special Education (the "CSE") for continued services (*Id*. ¶ 13.) As part of WV's CSE eligibility determination, Plaintiff specifically requested that WV receive a formal evaluation for Asperger syndrome and autism because WV's improvements during preschool had rendered manifestations of his disability more subtle. (*Id*. ¶ 14.)

Defendant Farruggio began as Ardsley's Director of Special Education in 2007. (*Id*. ¶ 15.) Farruggio oversaw WV's evaluations and chaired his eligibility meeting in August 2007. (*Id*. ¶ 16.) Ardsley's procedure for performing an evaluation for autism consisted of a referral to a medical doctor or someone with a similar level of medical expertise; Ardsley's usual

2

psychologists and speech and language pathologists do not possess the necessary expertise to diagnose autism. (*Id.* ¶ 20.) Despite Plaintiff's request, Farruggio decided not to refer WV for evaluation by a qualified expert and instead determined that WV did not have autism based on Farruggio's own review of WV's speech and language evaluation. (*Id.* ¶ 21.) Farruggio did not indicate that she possessed the license or certification necessary to make or refute an autism diagnosis and WV's evaluations did not indicate that Farruggio performed any of them herself or rendered a clinical judgment. (*Id.* ¶ 22.) Likewise, Farruggio did not notify Plaintiff that WV had not been assessed by a qualified evaluator to confirm or refute his diagnosis of Asperger syndrome or autism. (*Id.* ¶ 23.) Plaintiff alleges that she first learned that WV had not been evaluated by qualified expert during a February 2019 due process hearing. (*Id.* ¶ 24.)

In 2007, the CSE informed Plaintiff that WV scored highly on his tests and therefore deemed WV not to be a student with a disability under IDEA. (*Id.* ¶ 25.) Instead of providing WV with an Individualized Education Program ("IEP"), Ardsley provided WV with speech therapy under Section 504 for the 2007-2008 school year. (*Id.* ¶ 26.) Plaintiff consented to Ardsley's recommendations. (*Id.* ¶ 29.) Plaintiff alleges, however, that she would have questioned the accuracy of Ardsley's determinations if Plaintiff had been aware that WV had not been evaluated for Asperger's syndrome and autism by a qualified expert. (*Id.* ¶ 30.) Plaintiff also alleges that the CSE incorrectly informed her that WV was not eligible for an IEP when in reality WV was statutorily eligible for an IEP due to his receipt of speech therapy under Section 504. (*Id.* ¶ 32.)

In January 2008, Ardsley declassified WV altogether and discontinued all special services. (*Id.* ¶ 33.) Throughout elementary school, WV passed his classes and was promoted from grade to grade, notwithstanding his need for prompting and extra guidance to complete

assigned tasks. (*Id*. ¶ 34.) WV's second grade teacher, Ms. Sussman was concerned about WV's attentiveness and performed a screening test. (*Id*. ¶ 35.) Ms. Sussman informed Plaintiff that WV only got 3 out of 10 questions correct on a brief screening. (*Id*.) Plaintiff then had WV undergo medical evaluations for attention deficit, including audiological testing and a consultation with a sleep specialist. (*Id*. ¶ 36.) As part of WV's evaluation, Ms. Sussman completed a Conner's Rating Scale for WV, but failed to initiate a referral to CSE for formal evaluation by the school, notwithstanding her concerns as well as Plaintiff's. (*Id*. ¶ 37.)

III.   **Middle & High School**

When WV reached middle school, his difficulties completing assignments in a timely manner became more significant. (*Id*. ¶ 39.) WV's issues were further exacerbated by manifestations of Crohn's Disease, a gastrointestinal condition which substantially limited major life activities pertaining to digestion. (*Id*. ¶ 40.) WV failed to turn in his homework, to come to class prepared, and to make up missed work, which resulted in lower grades and disciplinary measures. (*Id*. ¶ 41.) Plaintiff informed WV's guidance counselor of WV's medical diagnosis and his past history of autism and classification under the CPSE, but Ardsley made no offers to provide Section 504 accommodations. (*Id*. ¶ 42.) Despite his low grades, WV qualified for John Hopkins University-Center for Talented Youth ("CTY") programs for gifted and talented students due to his high performance on a national test. (*Id*. ¶ 43.) Although WV was strong in math and science, WV was not selected to participate in his school's accelerated math track. (*Id*. ¶ 45.)

In middle school, WV began to exhibit a depressed mood. (*Id*. ¶ 48.) During each school year from 2013 through 2016, WV experienced an episode in school that required an evaluation by the suicide risk management team, which recommended that WV get a clearance to return to school due to concerns regarding his safety in school. (*Id*.) WV started seeing private

4

psychiatrists and a private psychologist with whom school staff communicated. (*Id*. ¶ 49.) WV's teachers frequently emailed Plaintiff regarding WV's inability to complete schoolwork and the issue became a source of conflict and emotional stress for Plaintiff and WV. (*Id*. ¶ 50.) Therefore, WV's psychologist advised Plaintiff to stop addressing such issues with WV. (*Id*. ¶ 51.) Without additional support from Plaintiff, WV was at high risk for failing his classes and Plaintiff shared her concerns with WV's guidance counsel and school psychologist. (*Id*. ¶ 52.) In response, Ardsley offered WV school-based Dialectical Behavior Therapy ("DBT"), a form of counseling offered to disabled and non-disabled students. (*Id*. ¶ 53.) Plaintiff inquired about the possibility that WV may qualify for special education, but the school psychologist informed her that WV would not qualify because he was only receiving a related service. (*Id*. ¶ 55.) WV's DBT program was a Response to Intervention ("RTI") program; however, Ardsley staff did not routinely monitor the progress of students in DBT, which Plaintiff alleges violated Ardsley policy and State guidelines. (*Id*. ¶ 56-57.)

On April 29, 2015, when WV's school performance had deteriorated to the point that he risked failing a class, Plaintiff initiated a referral to the CSE requesting a formal evaluation for a disability and WV's need for special education. (*Id*. ¶ 59.) Before a formal evaluation could be completed, WV experienced an emotional episode in school and the school's suicide risk assessment team sent WV home and required clearance prior to his return to school (*Id*. ¶ 61.) WV was hospitalized for a week and diagnosed with Major Depression and Pervasive Developmental Disorder. (*Id*. ¶ 62.)

During a June 25, 2015 CSE meeting, the CSE determined WV was eligible for IEP services under a classification of Emotional Disturbance. (*Id*. ¶ 63.) Plaintiff informed the CSE that WV's behaviors were due to his autism. (*Id*. ¶ 64.) During the meeting, participants also

discussed WV's fatigue and sleep issues, but Ardsley failed to evaluate WV for a sleep disorder. (*Id.* ¶ 65-70.) WV's June 2015 IEP provided no accommodations for WV's problems arising from dysregulated sleep. (*Id.* ¶ 71.) The CSE placed WV in Ardsley's Emotional Support Program ("ESP"). Despite the interventions, WV continued to have difficulties managing his work, frequented the school's Health Office, and spent more time in the ESP classroom than deemed appropriate by ESP staff. (*Id.* ¶ 73.) WV also continued to engage in acts of self-injury. (*Id.* ¶ 74.)

On September 25, 2015, Plaintiff sent an email to Defendant Fischer, WV's school psychologist, requesting that Ardsley perform a Functional Behavior Assessment ("FBA"). (*Id.* ¶ 75.) On September 29, 2015, after again being asked to take WV out of school due to his refusal to return to class, Plaintiff asked the District for a Behavioral Intervention Plan ("BIP"). (*Id.* ¶ 76.) Plaintiff reiterated this request in a September 30, 2015 email. (*Id.*) Neither Fischer nor Ardsley denied Plaintiff's request, so Plaintiff assumed Ardsley agreed. (*Id.* ¶ 77.) WV continued to fail to complete work on time and take trips to the ESP room and health office. (*Id.* ¶ 78.) Defendant Fischer explained that the school staff could not be expected to continuously monitor WV when he did not attend class and that WV's demands for attention were compromising the staff's ability to tend to other students. (*Id.* ¶ 79.)

On or about March 2016, Plaintiff recognized that WV needed more support than ESP could provide and requested a CSE meeting to discuss options. (*Id.* ¶ 80.) Plaintiff requested to review WV's FBA and BIP, only to find that no FBA had been conducted and there was no specific BIP in place for WV. (*Id.* ¶ 81.) Defendant Fischer indicated that an FBA was never performed because Plaintiff never provided consent; however, Ardsley never indicated that new

consent was necessary. (*Id*. ¶ 84.) Plaintiff requested that an FBA be performed as soon as possible and provided written consent on March 18, 2016. (*Id*. ¶ 85.)

Despite Plaintiff's request for a CSE meeting, the CSE did not convene. (*Id*. ¶ 86.) Defendant Fischer instead informed Plaintiff that he had discussed WV with Defendant Farruggio and Ms. Seda, the Assistant Director of Special Education, and they recommended that WV attend Intensive Outpatient Therapy ("IOP") or Intensive Day Treatment ("IDT"). (*Id*. ¶ 87.) WV's psychiatrists had deemed WV to be a poor candidate for IOP following his May 2015 hospitalization, so Plaintiff declined that option. (*Id*. ¶ 89.) Plaintiff and Defendant Fischer visited IDT on March 17, 2016. (*Id*. ¶ 91) During the visit, Defendant Fischer characterized WV's purported autism as a "misdiagnosis" and Plaintiff learned that IDT was a 30-plus day treatment. (*Id*. ¶ 92-93.) Plaintiff was concerned about removing WV from the mainstream for 30-plus days without a record of other interventions. (*Id*. ¶ 94-96.) Plaintiff chose not to enroll WV in IDT and again requested a CSE meeting. (*Id*. ¶ 97.) Ms. Seda informed Plaintiff that the IEP would not be changed and a CSE meeting was unnecessary. (*Id*. ¶ 98.)

## IV.    March 21, 2016 Incident & Transfer

On March 21, 2016, WV's teacher and Defendant Fischer attempted to get WV to sit up and work after WV put his head down on his desk during class. Defendant Fischer and WV's teacher removed WV's desk and chair from under him, and WV stayed in place standing, with his eyes closed and not speaking for the remainder of first period and into second period. (*Id*. ¶ 101.) During third period, WV went to the health office instead of math class. (*Id*. ¶ 102.) Defendant Fischer then directed WV from the first-floor health office to WV's third-floor math class by holding onto WV's shoulder and/or clothing on his back. (*Id*. ¶ 103.) Initially, WV did not speak and resisted Fischer's efforts by walking slowly and leaning back against Fischer's hand and attempting to shake or shrug Fischer away. (*Id*. ¶ 104.) Just before reaching the math

classroom, WV had a meltdown, which included banging his head on a locker, punching a wall, punching himself in the face, and verbally indicating his intent to continue self-injury at home. (*Id*. ¶ 105.) WV's math teacher came out of her classroom and attempted to calm WV down, while Defendant Fischer called WV's parents. (*Id*. ¶ 106-07.) When Plaintiff arrived to pick up WV, WV was fast asleep on a cot in the health office. (*Id*. ¶ 108.) WV was evaluated at two hospitals and both deemed WV to not require hospitalization, but to require an IEP revision. (*Id*. ¶ 115.)

Following the incident, WV was humiliated and refused to return to school. (*Idi* ¶ 116.) WV also refused to return to religious education classes because the same classmates were present. (*Id*. ¶ 117.) Therefore, Plaintiff had to homeschool WV in religious education. (*Id*. ¶ 118.) Plaintiff informed Ardsley of her intent to place WV in another school out of concern for his escalating behavior and the absence of any data that could be used to formulate a plan to prevent recurrence of potentially harmful behavior. (*Id*. ¶ 119.)

Plaintiff was able to place WV in Westfield Day School ("Westfield"), a small therapeutic school that offered individualized instruction and counseling. (*Id*. ¶ 126.) Westfield accommodated WV's fatigue with a late start and occasional naps. (*Id*.) On April 20, 2016, the CSE convened to discuss WV's placement. (*Id*. ¶ 127.) The CSE proposed an FBA but did not include among its target behaviors the need to prevent thoughts and acts of self-harm. (*Id*.) School staff attempted to persuade Plaintiff to return WV to Ardsley's school due to WV's friends at the school, but Plaintiff alleges that Ardsley and Defendant Fischer failed to provide specific preventative measures to ensure WV's safety. (*Id*. ¶ 131-32.) Defendant Farruggio steered the CSE towards a recommendation that WV return to the same unsuccessful placement in Ardsley's ESP and did so without a proposed re-evaluation of WV. (*Id*. ¶ 137-38.) Plaintiff

8

rejected the CSE's recommendations and continued WV's placement at Westfield for the remainder of the 2015-2016 school year. (*Id*. ¶ 143.) Plaintiff requested an Independent Educational Evaluation ("IEE") which confirmed that WV's manifestations were consistent with autism. (*Id*. ¶ 144.) Ardsley refused to reimburse Plaintiff for the full cost of the IEE and failed to initiate a due process hearing to defend its decision. (*Id*. ¶ 145.)

Because Westfield staff also observed WV's sleep issues, WV underwent a sleep study and was diagnosed with sleep apnea. (*Id*. ¶ 146.) Sleep apnea causes chronic sleep deprivation, unless WV uses a Continuous or Bilevel Positive Airway Pressure machine while sleeping. (*Id*.)

Ardsley ultimately agreed to place WV in the Karafin School ("Karafin"), a small therapeutic school similar to Westfield for the 2016-2017 school year. (*Id*. ¶ 147.) However, Ardsley failed to accommodate WV for sleep apnea by refusing to provide late bus pick-up. (*Id*. ¶ 148.) Plaintiff was forced to make her own arrangements to deliver WV to school at its late start time, which caused frustration, conflicts, stress, and emotional distress. (*Id*. ¶ 151.)

In preparation for WV's return to the mainstream classroom, during CSE meetings held in February 2017 and June 2017, Plaintiff requested that WV's goals specifically identify barriers that prevent him from turning in homework and instruct him in strategies to overcome those barriers. (*Id*. ¶ 154.) Because Karafin's programs did not provide a similar homework load to mainstream classes, Plaintiff requested that WV be provided supplemental work that would allow him to demonstrate the extent to which he can cope with mainstream workload, while also identifying any supports he may need. (*Id*. ¶ 155-156.) The CSE refused to hear Plaintiff's full proposal and characterized it as an attempt to overburden WV. (*Id*. ¶ 157-58.) Plaintiff gave the CSE notice that, if the IEP did not provide goals geared toward WV's enabling WV to succeed at handling a mainstream workload, Plaintiff would supplement WV's Karafin classes with

privately funding counseling and seek reimbursement. (*Id*. ¶ 162.) Plaintiff then obtained

counseling services for WV for the remainder of the school year. (*Id*. ¶ 163.)

## V.      Administrative Background & Procedural History

On September 24, 2017, Plaintiff filed a *pro se* due process complaint, which she

amended with the assistance of an attorney on October 2, 2017. (*Id*. ¶ 164-65.) The complaint

alleges that Ardsley denied WV Free Appropriate Public Education ("FAPE") for the 2015-2016

and 2017-2018 school years and that Ardsley failed to meet its obligations under the Child Find

provisions of the IDEA and Section 504 prior to Plaintiff's referral to the CSE for evaluation on

April 29, 2015. (*Id*. ¶ 166.) Plaintiff also alleged violations of Section 504, the ADA, and

Constitutional law. (*Id*. ¶ 167.) Plaintiff requested full reimbursement of WV's Westfield tuition,

the full cost of the 2015 IEE, and the full cost of transportation to Karafin, as well as any

appropriate "compensatory services." (*Id*. ¶ 158-59.)

During an October 2017 resolution meeting, *pro se* Plaintiff, Defendant Farruggio, and

Ms. Seda agreed that in exchange for withdrawal of Plaintiff's complaint, Ardsley would

reimburse WV's Westfield tuition and fully fund WV's IEE. (*Id*. ¶ 170.) Plaintiff initially agreed

to these terms, but the resolution failed when Ardsley's attorney insisted Plaintiff waive her

rights to non-IDEA claims and future claims. (*Id*. ¶ 171-72.) Due to Ardsley policy, the Section

504 violations were not examined during the hearing. (*Id*. ¶ 173-75.)

The CSE convened a meeting on November 30, 2017 to discuss WV's return to

mainstream classes. (*Id*. ¶ 176.) During the meeting, Plaintiff presented a letter from Dr.

Michelle Dunn indicating WV's motivation to return to the mainstream and the accommodations

he required to return. (*Id*. ¶ 177.) The CSE agreed to have WV return to mainstream high

school,with supports, during the second half of the school year. (*Id*. ¶ 178.) WV's transition to

mainstream high school was successful in that WV attended classes and performed well;

10

however, WV continued to have difficulty completing schoolwork in a timely manner. (*Id*. ¶ 180.)

Plaintiff filed a second due process complaint on June 12, 2018, based on Ardsley's failure to acknowledge CDOS Learning Standards ("CDOS LS") as a component of the general curriculum and the District's failure to recognize WV's deficits in the areas of organization and self-management as signs of his need for special instruction. (*Id*. ¶ 184.) The second complaint was originally dismissed as untimely; the complaint was later remanded to develop the record with respect to Ardsley's claims that claims were made outside the statute of limitations ("SOL"). The Impartial Hearing Officer ("IHO") consolidated the two complaints.

During the hearings, Plaintiff learned that the CSE and Defendant Fischer never believed WV suffered from autism. (*Id*. ¶ 190.) Plaintiff also learned that the CSE had never performed an evaluation of WV for autism in 2007. (*Id*.) Plaintiff learned that Farruggio considers DBT to be an RTI program, but that staff do not monitor student progress. (*Id*.) Plaintiff also learned that Defendant Fischer never considered performing an FBA for WV outside of Plaintiff's request, despite the fact that Defendant Fischer recommended WV for enrollment in IDT. (*Id*.)

On May 9, 2019, the IHO found that Ardsley denied WV FAPE during the 2015-2016 school year based on finding, among other things, that it failed to perform an FBA when there was an evident need to do so and in light of Plaintiff's request for one. (*Id*. ¶ 194.) The IHO awarded Plaintiff reimbursement for Westfield and the full cost of the IEE. (*Id*. ¶ 195.) However, the IHO did not award reimbursement for transportation to Karafin and found Plaintiff's claims based on events prior to April 29, 2015 to be time barred. (*Id*. ¶ 197.) The IHO awarded Plaintiff an evaluation by a board-certified behavior analyst ("BCBA") to address WV's residual deficits and to make recommendations for proper intervention. (*Id*. ¶ 196.) The IHO also found that

Ardsley offered WV FAPE for the 2017-2018 school year since Karafin eventually gave WV extra work outside of routine assignments, despite the fact that the IEP failed to indicate the provision of such work. (*Id.* ¶ 198.)

Plaintiff requested a review by the State Review Officer ("SRO") of the IHO's decision to deny reimbursement for WV's transportation to Karafin and the IHO's finding that Ardsley's IEP for the 2017-2018 school year offered WV FAPE because Karafin provided WV with extra work. (*Id.* ¶ 199.) The SRO affirmed the IHO's decisions, except for the IHO's ruling regarding Karafin transportation and awarded Plaintiff costs for the service. (*Id.* ¶ 202-03.)

On November 18, 2019, Plaintiff filed a *pro se* complaint before this Court. (ECF No. 1.) Plaintiff filed a *pro se* Amended Complaint on  February 14, 2020 (1) requesting judicial review of portion of the SRO's decision, (2) requesting designation as the prevailing party in the administrative proceedings, (3) alleging discrimination in violation of Section 504 and the ADA, (4) alleging retaliation, intimidation, and interference in violation of Section 504, and the ADA, (5) alleging violations of the Equal Protection Clause of the Fourteenth Amendment, (6) alleging a conspiracy by district personnel to deprive Plaintiff and WV of their Equal Protection of the laws, (7) alleging violations of the Fourth Amendment, Eighth Amendment, and the Substantive Due Process Clause of the Fourteenth Amendment, and (8) seeking punitive damages. On February 28, 2020, Defendants served their motion to dismiss the Amended Complaint. (ECF No. 28-2.) On April 14, 2020, Plaintiff retained *pro bono* counsel to represent her in this matter. (ECF No. 24 & 25.)

## MOTION TO DISMISS STANDARD

On a motion to dismiss under Fed. R. Civ. P. 12(b)(6), dismissal is proper unless the complaint "contain[s] sufficient factual matter, accepted as true, to 'state a claim to relief that is

plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). When there are well-pleaded factual allegations in the complaint, "a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Id*. at 679. "Although for the purpose of a motion to dismiss [a court] must take all of the factual allegations in the complaint as true, [it is] 'not bound to accept as true a legal conclusion couched as a factual allegation.'" *Id*. (quoting *Twombly*, 550 U.S. at 555). It is not necessary for the complaint to assert "detailed factual allegations," but must allege "more than labels and conclusions." *Twombly*, 550 U.S at 555. The facts in the complaint "must be enough to raise a right to relief above the speculative level on the assumption that all the allegations in the complaint are true." *Id*.

"Pro se complaints are held to less stringent standards than those drafted by lawyers, even following Twombly and Iqbal." *Thomas v. Westchester*, No. 12–CV–6718 (CS), 2013 WL 3357171, at *2 (S.D.N.Y. July 3, 2013). The court should read pro se complaints "'to raise the strongest arguments that they suggest,'" *Kevilly v. New York*, 410 F. App'x 371, 374 (2d Cir. 2010) (summary order) (quoting *Brownell v. Krom*, 446 F.3d 305, 310 (2d Cir. 2006)); *see also Harris v. Mills*, 572 F.3d 66, 72 (2d Cir. 2009) ("even after *Twombly*, though, we remain obligated to construe a pro se complaint liberally"). "However, even pro se plaintiffs asserting civil rights claims cannot withstand a motion to dismiss unless their pleadings contain factual allegations sufficient to raise a right to relief above the speculative level." *Jackson v. N.Y.S. Dep't of Labor*, 709 F. Supp. 2d 218, 224 (S.D.N.Y. 2010) (quoting *Twombly*, 550 U.S. at 555) (internal quotations omitted). Dismissal is justified, therefore, where "the complaint lacks an allegation regarding an element necessary to obtain relief," and therefore, the "duty to liberally construe a plaintiff's complaint [is not] the equivalent of a duty to re-write it." *Geldzahler v. N.Y.*

13

*Med. Coll.*, 663 F. Supp. 2d 379, 387 (S.D.N.Y. 2009) (internal citations and alterations omitted).

## DISCUSSION

### I.    Claims Brought on Behalf of WV

Defendants argue that claims brought by Plaintiff on behalf of WV must be dismissed because it is "a well-established general rule in this Circuit that a parent not admitted to the bar cannot bring an action pro se in federal court on behalf of his or her child." *Tindall v. Poultney High Sch. Dist.*, 414 F.3d 281, 284 (2d Cir. 2005). However, after filing the Complaint *pro se*, Plaintiff later obtained pro bono counsel. (ECF No. 24, 25.) Therefore, this issue is now moot and the Court declines to dismiss claims brought on behalf of WV due to lack of counsel. *See Cheung v. Youth Orchestra Found. of Buffalo, Inc.*, 906 F.2d 59, 62 (2d Cir. 1990) (remanding matter to give *pro se* plaintiff bringing claims on behalf of his minor daughter and opportunity to retain counsel to avoid dismissal of complaint).

### II.    Statute of Limitations

#### A.    *Generally*

"[A]n IDEA claim accrues when the plaintiff knows or has reason to know of the injury that is the basis of the action." *Somoza v. N.Y.C. Dep't of Educ.*, 538 F.3d 106, 116 (2d Cir. 2008) (citing *M.D. v. Southington Bd. of Educ.*, 334 F.3d 217, 221 (2d Cir. 2003)). Once a claim accrues, a plaintiff has two years to act or risk the claim becoming time-barred. See 20 U.S.C. § 1415(b)(6)(B) (a plaintiff must have "[a]n opportunity ... to present a complaint ... which sets forth an alleged violation that occurred not more than 2 years before the date the parent or public agency knew or should have known about the alleged action that forms the basis of the complaint"); 20 U.S.C. § 1415(f)(3)(C) ("A parent or agency shall request an impartial due

14

process hearing within 2 years of the date the parent or agency knew or should have known about the alleged action that forms the basis of the complaint").

The statute of limitations for Plaintiff's ADA, Section 504, and Section 1983 claims is three years. *Rekowicz v. Sachem Cent. Sch. Dist.*, 2013 WL 4852305, at *6 (E.D.N.Y. Sept. 10, 2013) (holding that plaintiff's Section 504 and ADA claims subject to three-year statute of limitations); *BD v. DeBuono*, 130 F. Supp. 2d 401, 424 (S.D.N.Y. 2000) (holding that plaintiff's Section 504 and Section 1983 claims subject to three-year statute of limitations).

Defendants seek to apply the IDEA's two-year statute of limitations to Plaintiff's other federal claims because the IDEA claims are virtually identical to the other federal claims and applying a different statute of limitations would frustrate federal policy. (ECF No. 28-1 at 5.) Defendants rely on Third Circuit precedent to support their case. *See P.P. v. West Chester Area Sch. Dist.*, 585 F. 3d 727 (3rd Cir. 2009). However, Defendants themselves concede that, despite acknowledging the persuasiveness of *P.P.*, courts in the Second Circuit have yet to apply its holding. (ECF No. 28-1 at 6.) Further, in a similar case, considering the same argument presented by Defendants, the Second Circuit declined to reconsider its prior holdings and "apply the IDEA's two-year statute of limitations for Section 504 claims in the education context." *Bd. of Educ. of N. Rockland Cent. Sch. Dist. v. C.M. on behalf of P.G.*, 744 F. App'x 7, 10 (2d Cir. 2018). The Court is bound by the precedent set by the Second Circuit. Therefore, the Court finds that a three-year statute of limitations applies to Plaintiff's non-IDEA federal claims.

B.    *Minority Tolling*

Plaintiff argues that claims brought on behalf of WV are subject to minority tolling. (ECF No. 28-3 at 11.) *See J.R. v. N.Y.C. Dep't of Educ.*, 2015 WL 5007918 at *4 n.9 (E.D.N.Y. Aug. 20, 2015) (applying minority tolling to claims brought under Section 504 and ADA where claims were brought on behalf of a minor and Defendants conceded minority tolling applied); *Mione v.*

*McGrath*, 435 F. Supp. 2d 266, 270 (S.D.N.Y. 2006) (finding statute of limitations for claims brought on behalf of minors under 42 U.S.C. §§ 1981, 1983, 1985, and 1986 tolled); *Kulpa on Behalf of Kulpa v. Glass*, 903 F. Supp. 321, 322 (N.D.N.Y. 1995) (finding statute of limitations for claims brought on behalf of a minor under Section 1983 subject to minority tolling).

"The Supreme Court has clarified that federal courts must borrow a state's equitable tolling rules unless to do so 'would defeat the goals of the federal statute at issue.'" *M.D. v. Southington Bd. of Educ.*, 334 F.3d 217, 224 (2d Cir. 2003) (quoting *Hardin v. Straub*, 490 U.S. 536, 539 (1989)). "One of the fundamental goals of the statutory scheme codified in the IDEA is to promote the expeditious resolution of educational programming disputes." *Id.* (citing *Adler v. Educ. Dep't of N.Y.*, 760 F.2d 454, 459-60 (2d Cir.1985)).

The Court finds that application of minority tolling to claims brought under the IDEA, ADA, and Section 504 would frustrate federal policy. *Piazza v. Fla. Union Free Sch. Dist.*, 777 F. Supp. 2d 669, 691 (S.D.N.Y. 2011) (finding the same because "[t]he statutory scheme created by the IDEA, which seeks to channel such claims through administrative proceedings that allow state and local educational officials to address problems, has as its goal the prompt presentation and resolution of disputes, thus allowing the student to get the services he or she needs as quickly as possible."); *L.K. v. Sewanhaka Cent. High Sch. Dist.*, 2015 WL 12964663, at *12 (E.D.N.Y. July 16, 2015), aff'd, 641 F. App'x 56 (2d Cir. 2016).[1] On the other hand, the Section 1983 claims pertaining to the March 16, 2016 incident are subject to minority tolling. *Mione*, 435 F. Supp. 2d at 270; *Kulpa on Behalf of Kulpa*, 903 F. Supp. at 322.[2]

---

[1] For similar reasons, the continuing violation doctrine does not apply to these claims. *See SJB ex rel. Berkhout v. N.Y.C. Dep't of Educ.*, No. 03 CIV. 6653 (NRB), 2004 WL 1586500, at *7 (S.D.N.Y. July 14, 2004).

[2] This is consistent with most of the cases relied on by Plaintiff. Only one of the cases cited by Plaintiff— J.R.—involves a claim brought under Section 504 or IDEA; the remaining cases address tolling in the context of Section 1983 and other claims.

**III.     Section 504 and ADA Discrimination and Retaliation Claims**

To establish a prima facie case of discrimination under either the ADA or Section 504, a plaintiff must allege that: (1) plaintiff is a "qualified individual with a disability;" (2) plaintiff was "excluded from participation in a public entity's services, programs or activities or was otherwise discriminated against by [the] public entity;" and (3) "such exclusion or discrimination was due to [plaintiff's] disability." *B.C. v. Mount Vernon Sch. Dist.*, 837 F.3d 152, 158 (2d Cir. 2016) (citing *Fulton v. Goord*, 591 F.3d 37, 43 (2d Cir. 2009) (quoting *Hargrave v. Vt.*, 340 F.3d 27, 34-35 (2d Cir. 2003))).

*A.     Qualified Individual with a Disability*

Under Section 504 and the ADA, a "'disabled individual' [is] one who '(i) has a physical or mental impairment which substantially limits one or more of such person's major life activities, (ii) has a record of such an impairment, or (iii) is regarded as having such an impairment.'" *Weixel v. Bd. of Educ. of N.Y.C.*, 287 F.3d 138, 147 (2d Cir. 2002). "[T]he ADA and IDEA set forth distinct legal standards in their definitions of 'disability,' such that an individual will not qualify for the ADA's protections simply by virtue of his or her disabled status under the IDEA." *B.C.*, 837 F.3d at 160. "[A] child might 'need[ ] special education and related services' by reason of an impairment," as required by the IDEA, "even if that impairment does not 'substantially limit[ ] ... [a] major life activit[y],'" the definition of a disability under the ADA. *Id.* at 159 (comparing 20 U.S.C. § 1401(3)(A), with 42 U.S.C. § 12102(1)(A)). "A plaintiff seeking redress under the ADA must 'show that any limitations are in fact substantial, not amounting to only a mere difference in conditions, manner, or duration.'" *Id.* at 160. (quoting *Bartlett v. N. Y. State Bd. of Law Exam'rs*, 226 F.3d 69, 80 (2d Cir. 1998)). Thus, "[t]hose seeking relief pursuant to ADA or Section 504 must come forward with additional evidence—

beyond simply their eligibility for IDEA coverage—showing their eligibility for the remedies afforded by the ADA and Section 504." *Id.* at 161 (internal quotations omitted).

The Amended Complaint alleges that professionals have diagnosed WV with Asperger Syndrome, sleep apnea, Major Depression, and Pervasive Development Disorder. The Amended Complaint further details how, as a result of these conditions, WV has suffered from fatigue, impulses to commit self-injury, and inability to complete schoolwork. According to the Amended Complaint, these conditions culminated in WV's removal from a "mainstream" classroom setting. Therefore, it is the Court's finding that the *pro se* Amended Complaint adequately alleges that WV is a qualified individual with a disability. *Weixel v. Bd. of Educ. of N.Y.C.*, 287 F.3d 138, 147 (2d Cir. 2002).

### B. Exclusion or Discrimination

"Exclusion or discrimination may take the form of disparate treatment, disparate impact, or failure to make a reasonable accommodation." *Mount Vernon Sch. Dist.*, 837 F.3d at 158. Plaintiff alleges the following forms of exclusion or discrimination: (1) denial of access to a dispute resolution process for Section 504 disputes, (2) denial of access to FAPE, (3) creation of a hostile environment for WV, (4) denial of accessible transportation, and (5) denial of mainstream education as the least restrictive environment.

Defendants argue that Plaintiff's denial of access to FAPE claim should be dismissed "to the extent that it alleges a § 504 violation based on the alleged denial of FAPE due to [Ardsley's] failure to conduct an FBA or a BIP." (ECF No. 28-1 at 9.) The Court agrees that an FBA is "not explicitly required to guaranty access to a FAPE." *Id.* at 10. *See M.H. v. New York City Dep't of Educ.*, 712 F. Supp. 2d 125, 159 (S.D.N.Y. 2010), aff'd, 685 F.3d 217 (2d Cir. 2012) (failure to conduct FBA does not render IEP procedurally deficient). However, Plaintiff alleges several other facts to support her argument that WV was denied access to FAPE. As such, the Court will

not dismiss Plaintiff's denial of access to FAPE claim.[3] Defendants do not challenge Plaintiff's other discrimination claims.

### C.    Retaliation

"[T]he elements of a retaliation claim under either Section 504 or the ADA are '(i) a plaintiff was engaged in protected activity; (ii) the alleged retaliator knew that plaintiff was involved in protected activity; (iii) an adverse decision or course of action was taken against plaintiff; and (iv) a causal connection exists between the protected activity and the adverse action.'" *Weixel v. Bd. of Educ. of N.Y.C.*, 287 F.3d 138, 148 (2d Cir. 2002) (quoting *Weixel v. Bd. of Educ. of N.Y.C.*, 2000 WL 1100395, at *4 (S.D.N.Y. Aug. 7, 2000)) (citing *Weissman v. Dawn Joy Fashions, Inc.*, 214 F.3d 224, 234 (2d Cir.2000)).

Plaintiff alleges that Defendants retaliated against her due to her continued advocacy on behalf of her son by failing to respond to or implement her requests, by engaging in heated exchanges with Plaintiff, and by using excessive force against WV. Plaintiff alleges she was designated as a "difficult case" due to her advocacy for WV and her other disabled children. As an initial matter, some of the conduct alleged by Plaintiff falls outside the statute of limitations. Further, the Court does not believe that heated interactions with Defendant Fischer qualify as "adverse conduct."

As to the remaining allegations, the Court finds that Plaintiff fails to sufficiently plead a causal connection between the adverse actions and her advocacy. Plaintiff's advocacy was ongoing over a period of approximately one decade. Throughout that time, she regularly requested accommodations, assessments, and services for her children. Plaintiff attempts to rely

---

[3] Defendants argue that Plaintiff may not recover reimbursement for Westfield, the IEE, or WV's transportation costs under § 504 because Plaintiff already recovered reimbursement for these expenses under the IDEA. Plaintiff agrees and indicates she did not request this form of relief. (ECF No. 28-3 at 22.) Therefore, the Court need not address this argument.

on temporal proximity between the denial of her requests and her advocacy to show a causal connection between adverse actions and protected activity. The Court is not inclined to agree that every time a school denies a parent's request, the parent can demonstrate a *prima facie* retaliation case based off the temporal proximity between the request and denial alone. Without more than mere temporal proximity, Plaintiff fails to plead a retaliation claim as to the denials and failures to respond to her requests. Finally, with respect to the alleged excessive force against WV, Plaintiff again fails to show a causal connection between her advocacy and Fischer's alleged use of force. Although Plaintiff engaged in ongoing advocacy, it was over a long period of time and Plaintiff offers no facts to show why Fischer would retaliate in this way at this specific time. Without more allegation of a causal connection, Plaintiff fails to sufficiently plead her retaliation claims. As such, the Court dismisses Plaintiff's retaliation claims.

## IV.     Section 1983 Claims

### A.     *Generally*

Defendants argue that Plaintiff's Section 1983 claims must be dismissed because (1) Plaintiff lacks standing, (2) Plaintiff cannot recover under Section 1983 for simple violations of the IDEA when there has been no denial of access to the IDEA's administrative remedies, (3) there has been no deprivation of federally protected rights, (4) Plaintiff fails to plead Defendants' involvement, (5) qualified immunity applies, and (6) Plaintiff fails to state a claim for municipal liability.

As a threshold matter, Plaintiff's failure to address these arguments as they pertain to Section 1983 claims outside of the March 21, 2016 incident, constitutes an abandonment of these claims. *Lipton v. Cnty. of Orange*, 315 F. Supp. 2d 434, 446 (S.D.N.Y. 2004) ("This Court may, and generally will, deem a claim abandoned when a plaintiff fails to respond to a defendant's arguments that the claim should be dismissed."); *Taylor v. City of New York*, 269 F. Supp. 2d 68,

75 (E.D.N.Y. 2003) ("Federal courts may deem a claim abandoned when a party moves for summary judgment on one ground and the party opposing summary judgment fails to address the argument in any way.").  Accordingly, the bulk of Plaintiff's Section 1983 claims are properly dismissed as abandoned.[4]

### B.      Failure to Plead Section 1983 Claim Pertaining to March 21, 2016 Incident

As to the 1983 claim alleging excessive force during the March 21, 2016 incident, the Court finds that Defendants cannot be held liable.

"Plaintiffs have a constitutional 'right to be free from the use of excessive force' in the 'non-seizure, non-prisoner context.'" *Dockery v. Barnett*, 167 F. Supp. 2d 597, 602 (S.D.N.Y. 2001) (citing *Johnson v. Newburgh Enlarged Sch. Dist.*, 239 F.3d 246 (2d Cir. 2001) (citing *Rodriguez v. Phillips*, 66 F.3d 470, 476 (2d Cir. 1995))). "In determining whether the constitutional line has been crossed, factors to be considered include 'the need for the application of force, the relationship between the need and the amount of force that was used, the extent of injury inflicted, and whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm.'" *Id*. (quoting *Johnson v. Newburgh Enlarged Sch. Dist.*, 239 F.3d 246 (2d Cir. 2001)) (citing *Johnson v. Glick*, 481 F.2d 1028, 1033 (2d Cir. 1973); as well as *Metzger v. Osbeck*, 841 F.2d 518, 520 (3d Cir. 1988) and *Hall v. Tawney*, 621 F.2d 607, 613 (4th Cir.1980))). Plaintiff alleges that during the March 21, 2016 incident WV was unable to stay awake in class due to his disabilities. In response, Fischer removed WV's chair and desk, forcing him to stand. Plaintiff alleges that

---

[4] Further, these claims are also properly dismissed for other reasons. Plaintiff lacks standing to bring a Section 1983 claim on her own behalf. *Morgan v. City of New York*, 166 F. Supp. 2d 817, 819 (S.D.N.Y. 2001), and Plaintiff may not use Section 1983 to seek damages for violations of the IDEA where she "was afforded a hearing before an impartial hearing officer and review by a state review office." *Streck v. Bd. of Educ. of E. Greenbush Sch. Dist.*, 280 F. App'x 66, 68 (2d Cir. 2008).

Fischer's actions served "not to restore discipline, but only to humiliate WV in front of his classmates." (ECF No. 28-3 at 23.) Plaintiff further alleges that Fischer "seized" WV and "pushed him against his will across the school, despite knowing that WV had severe emotional issues." *Id*.

Plaintiff attempts to analogize the March 21, 2016, to the facts of *Dockery*, where autistic elementary school children were force-fed against their will and children were grabbed with enough force to leave a handprint, fingernail mark, bruise, or cause tears. *Id*. at 602-03. In *Dockery*, the children received scratches and bruises, along with severe psychological issues. *Id*. Here, Plaintiff alleges no physical injuries, but rather that Fischer humiliated WV by removing his chair and desk and "physically propelled WV from the first-floor health office to his 3rd floor Math class, by holding onto WV's shoulder and/or the clothing on his back." (ECF No. 14 at 10.) While the Court is sympathetic to the level of embarrassment that WV may have suffered, the facts are insufficient to support a finding that Fischer engaged in these acts maliciously or sadistically. The minimal use of force applied to WV to escort him to class is the type of force indicative of a good faith effort to restore discipline. Further, while Fischer's attempts to get WV to pay attention in class by removing his desk and chair may have been ill-advised, they involved no application of force, no physical injuries, and served the legitimate purpose of preventing WV from resting his head on his desk. Therefore, the Court finds that Plaintiff fails to sufficiently plead her Section 1983 claim.

   C.   *Immunity*

Furthermore, even if the Amended Complaint sufficiently plead excessive force, Defendant Fischer is entitled to qualified immunity, because Fischer reasonably believed his

conduct was lawful. [5] Likewise, Defendant Farruggio and Defendant Ardsley cannot be held

liable for the incident because Plaintiff fails to plead personal involvement or municipal liability.

*See Black v. Coughlin*, 76 F.3d 72, 74 (2d Cir. 1996) (holding that a defendant in a Section 1983

cannot be held liable for damages for constitutional violations merely because she held a high

position of authority); *Warren v. Pataki*, 823 F.3d 125, 136 (2d Cir. 2016) ("a plaintiff must

establish a given defendant's personal involvement in the claimed violation in order to hold that

defendant liable in his individual capacity"); *Monell v. Dep't of Soc. Servs. of N.Y.C.*, 436 U.S.

658, 659 (1978) (a municipality may only be held liable under Section 1983 where "the action

that is alleged to be unconstitutional implements or executes a policy statement, ordinance,

regulation, or decision officially adopted or promulgated by those whose edicts or acts may fairly

be said to represent official policy").

Therefore, it is the Court's determination that Plaintiff's Section 1983 claims are properly

dismissed.

---

[5] "In actions under 42 U.S.C. § 1983, good faith or qualified immunity is an affirmative defense which must be pleaded by the defendant officials." *Williams v. Smith*, 781 F.2d 319, 322 (2d Cir. 1986) (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 815, (1982); *Sec. & Law Enforcement Emp. Dist. C. 82 v. Carey*, 737 F.2d 187, 210 (2d Cir. 1984)). Under the doctrine of qualified immunity, "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, (1982); *Johnson v. Perry*, 859 F.3d 156, 169 (2d Cir. 2017). "The qualified immunity standard gives ample room for mistaken judgments by protecting all but the plainly incompetent or those who knowingly violate the law," *McClenton v. Menifee*, 2006 WL 2474872, at *14 (S.D.N.Y. Aug. 22, 2006) (quoting *Hunter v. Bryant*, 502 U.S. 224, 229 (1991) (per curiam) (internal citation and quotation marks omitted)). Qualified immunity protects defendants not just from liability, but also from having to litigate at all. *Saucier v. Katz*, 533 U.S. 194, 200 (2001).

There is a two-step analysis to determine whether an official is entitled to qualified immunity. *Saucier*, 533 U.S. at 201-02; *Loria v. Gorman*, 306 F.3d 1271, 1281 (2d Cir. 2002). "In resolving the question of qualified immunity, a court must decide whether the alleged conduct was a violation of a constitutional right and whether the right at issue was 'clearly established' at the time of defendant's alleged misconduct," *Gonzalez v. City of Schenectady*, 728 F.3d 149, 164 n.2 (2d Cir. 2013) (citing *Saucier*, 533 U.S. at 201; *see also Hope v. Pelzer*, 536 U.S. 730, 739, (2002) (holding that contours of constitutional right violated must be sufficiently clear).

## V.     Section 1985 Claims

Plaintiff's § 1985 claims arise out of a purported conspiracy to provide inadequate services to her children as a result of her advocacy on their behalf. Plaintiff lists conspiratorial acts including: (1) attempting to place WV in IDT without convening a CSE meeting, (2) refusing to document Fischer's observations of WV regarding the March 2016 incident, (3) refusing to perform the FBA, (4) refusing to allow Ardsley's staff to speak with admissions departments of other schools WV sought to transfer to, (5) steering the CSE towards placing WV back in Ardsley's home school, and (6) deferring an FBA until WV returned to Ardsley's school. (ECF No. 14 at 42-43.)

Section 1985(3) prohibits two or more persons from conspiring for the purpose of depriving any person of the equal protection of the laws or of equal privileges and immunities under the laws. 42 U.S.C. § 1985(3). To adequately plead a claim under Section 1985(3), a plaintiff must allege "(1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of equal protection of the laws, or of equal privileges and immunities under the laws; [and] (3) an act in furtherance of the conspiracy; (4) whereby a person is either injured in his person or property or deprived of any right of a citizen of the United States." *Mian v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 7 F.3d 1085, 1087 (2d Cir. 1993) ;*see Thomas v. Roach*, 165 F.3d 137, 146 (2d Cir. 1999) (citing *Traggis v. St. Barbara's Greek Orthodox Church*, 851 F.2d 584, 586-87 (2d Cir. 1988)). A Section 1985(3) claim also requires "some racial, or perhaps otherwise class-based, invidiously discriminatory animus behind the conspirators' action*." Griffin v. Breckenridge*, 403 U.S. 88, 102 (1971).

Defendants argue that Plaintiff fails to allege any class-based invidious discriminatory animus and that Plaintiff is barred from asserting conspiracy claims against Defendants under the intercorporate conspiracy doctrine. As a threshold matter, Plaintiff once again fails to address

24

Defendants' arguments, and these claims are therefore abandoned. Nonetheless, the Court finds that the claims would also fail due to a lack of allegations suggesting discriminatory animus. At best, Plaintiff alleges heated disagreements with Defendant Fischer; however, these disagreements do not rise to the level of discriminatory animus. Therefore, the Court dismisses Plaintiff's Section 1985 claims.

## VI.    Punitive Damages

Because Plaintiff fails to plead Section 1983 and 1985 claims, Plaintiff's claim for punitive damages is properly dismissed.

## VII.    Leave to Amend

Although Plaintiff is now represented by counsel, she submitted her Amended Complaint *pro se*. As such, the Court grants Plaintiff leave to amend her claims consistent with this opinion.[6]

**CONCLUSION**

For the foregoing reasons, Defendants' motion to dismiss is GRANTED in part and DENIED in part. As the dismissed claims are dismissed without prejudice, Plaintiff is granted leave to file a Second Amended Complaint on or before April 19, 2021. Should Plaintiff fail to file a Second Amended Complaint, the First Amended Complaint shall be deemed the operative complaint. Defendants are directed to answer, or otherwise respond to, the operative complaint on or before May 10, 2021.

---

[6] The Court disagrees with Defendants' assertion that allowing Plaintiff leave to amend would necessarily be futile. The Court can conceive of additional facts that Plaintiff could allege that would allow her claims to survive.

If Defendants file an answer, the parties are directed to jointly complete and submit a Case Management Plan and Scheduling Order (blank form attached hereto) by May 17, 2021. The Court will issue an Order of Reference to Magistrate Judge Paul E. Davison and the parties are directed to contact Judge Davison within seven (7) business days of the date of the Order of Reference to schedule a conference.

The Clerk of the Court is directed to terminate the motion at ECF No. 28.

Dated:    March 18, 2021                                    SO ORDERED:

       White Plains, New York

_____

NELSON S. ROMÁN

United States District Judge